751 N.E.2d 54 (2001)
323 Ill. App.3d 1
256 Ill.Dec. 1
In re D.H., L.H., and E.H., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Wanda H., Respondent-Appellant).
No. 1-99-3077.
Appellate Court of Illinois, First District, First Division.
May 21, 2001.
*55 'Lanre O. Amu, Chicago, for Respondent-Appellant.
Richard A. Devine, Cook County State's Attorney, Chicago (Renee Goldfarb, Jennifer Streeter, Kathleen C. Johnson, of counsel), for Petitioner-Appellee.
Patrick T. Murphy, Charles P. Golbert, Office of the Cook County Public Guardian, Chicago, for Minors D.H., L.H., E.H.
Justice FROSSARD delivered the opinion of the court:
Respondent Wanda H. appeals from the circuit court's orders finding her an unfit parent and terminating her right to parent D.H., E.H., and L.H. On appeal, respondent contends that the State failed to prove that she was unfit and that the court erred by terminating her right to parent D.H., E.H., and L.H. We affirm.

I. BACKGROUND
D.H. was born to respondent on November 2, 1991, and tested positive for cocaine at that time. In March 1992, the Department of Children and Family Services (DCFS) took custody of D.H. after he was taken to the hospital for chemical burns he *56 sustained when nail polish remover spilled on his mouth and chest while he was unsupervised. On December 3, 1992, the circuit court entered an adjudication order, finding D.H. neglected due to lack of care. On April 26, 1994, the circuit court entered an order adjudicating D.H. a ward of the court.
Respondent gave birth to E.H. on September 11, 1988, and to L.H. on February 17, 1993. DCFS obtained custody of L.H. and E.H. in July 1994 after determining they were at risk based on respondent's lack of progress in treating her drug addiction. On August 3, 1995, the court entered an order adjudicating L.H. and E.H. abused and neglected based on an injurious environment, and on November 1, 1995, it entered orders adjudicating L.H. and E.H. wards of the court.
On December 16, 1996, the State filed petitions to terminate respondent's right to parent D.H., L.H., and E.H. and to appoint a guardian with the right to consent to adoption. The petitions for all three children alleged that respondent was unfit because she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to their welfare; (2) failed to make reasonable efforts to correct the conditions which were the basis for their removal and/or failed to make reasonable progress toward their return home within 12 months after the adjudication of neglect or abuse; (3) failed to protect them from conditions in their environment injurious to their welfare; and (4) was a habitual drunkard and/or addicted to drugs for one year immediately prior to the commencement of the action. The petitions also alleged that terminating respondent's parental rights and appointing a guardian with the right to consent to adoption would be in D.H.'s best interest because he had resided with his foster parent(s) since March 1992, in E.H.'s best interest because she had resided with her foster parent(s) since October 1996, and in L.H.'s best interest because she had resided with her foster parent(s) since June 1996. The petitions further alleged that termination was in the best interests of all three children because their respective foster parents were considering adoption.
The State called two witnesses at the fitness hearing, Ardella Alberts, a foster-parent recruiter with the Evangelical Child and Family Agency (ECFA), and Colleen Hoy, a former social worker with ECFA.
Alberts testified she was assigned to the cases of D.H., E.H., and L.H. from May 1995 to February 1996 and had numerous contacts with respondent during that time. Alberts stated that respondent's file reflected a history of drug abuse and noted that respondent failed to submit documentation verifying her attendance at Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings as required by her DCFS service plan. Although respondent tested positive for cocaine in June 1995 and appeared to be under the influence of drugs or alcohol at an August 1995 court appearance, she did not follow Alberts' recommendations that she complete a drug treatment program.
Between June 1995 and March 1996, respondent only visited D.H., E.H., and L.H. two or three times despite the fact that she was allowed to meet D.H. once a month and to meet E.H. and L.H. once a week until November 1995 and thereafter on a monthly basis. Alberts had to end the first visit early because respondent was belligerent and verbally abusive. During the second visit, respondent appeared to be under the influence of drugs or alcohol. When Alberts inquired about her appearance, respondent stated her eyes were red because she had been crying. Alberts could not recommend *57 unsupervised visitation with the children because of respondent's drug use and belligerent behavior. In November 1995, the permanency goals for L.H. and E.H. were changed from return home to foster care placement due to respondent's failure to comply with recommended services, her inconsistent visitation with the children, and her failure to stop using drugs.
Colleen Hoy testified that she had frequent telephone and in-person contact with respondent while she was assigned to her case from August 1994 until approximately May 1995 and from March 1996 until February 1997. When Hoy first became involved in the case, respondent was not involved in any services. Hoy noted that respondent had previously been enrolled in a drug treatment program at Doctors Hospital in May 1994. Although the program required a 10-day inpatient stay, six weeks of intensive outpatient therapy, and six months of follow-up therapy, respondent only completed the 10-day inpatient program and dropped out of the outpatient program after attending only one session.
Respondent told Hoy on two separate occasions that she did not have a drug problem and claimed that she was unable to attend the intensive outpatient program because she did not have a child care provider. Respondent subsequently agreed to attend an outpatient drug treatment program through the Brass Foundation if child care was provided. Although the foundation offered her child care, respondent failed to complete the program. Hoy noted that in June 1996, respondent enrolled in the South East Drug and Alcohol Abuse Center (SEDAC) but did not give Hoy documentation verifying her completion of the program. Furthermore, respondent failed to provide Hoy with documentation confirming her participation in AA and NA as required by her service plan. Hoy stated that respondent's visitation with D.H., E.H., and L.H. was inconsistent during the entire time she worked with the family. Respondent was 30 minutes late to at least two visits, frequently spent more time trying to convince Hoy to return the children home than she would interacting with her children, and repeatedly accused Hoy "of anything and everything." Although required to bring nutritional snacks to the visits for her children to eat, respondent normally brought candy and chips. Based on respondent's failure to comply with services and the inadequate nature of her visits, Hoy did not recommend unsupervised visits while she was working with the family.
Respondent testified that she had seven children, that her son D.H. was born cocaine-exposed, and that shortly after his birth, his cousin climbed onto a dresser and spilled nail polish remover on his face while they were under the supervision of respondent's mother. Respondent was not present at the time of the incident but did take D.H. to the hospital upon her return.
Respondent stated that she last used cocaine in 1995 and noted that during the preceding eight years, she had given over 100 drug and alcohol drops, only one of which tested positive. Respondent further stated that she never refused any counseling services after DCFS became involved with her family. She completed a parenting class at the Woodlawn Organization, received counseling through the Brass Foundation, successfully completed a substance abuse program at SEDAC, and went to "about a hundred" AA or NA meetings. Respondent explained that she also received inpatient treatment at Doctors Hospital and subsequently received treatment through Gateway. Doctors Hospital records presented at the hearing show that respondent was admitted there during May 1994 for detoxification and *58 rehabilitation from drugs and alcohol. A "Discharge Summary" from the hospital indicates that she stayed there for over a week and was diagnosed upon her release with alcohol dependence, cocaine abuse, and a history of depression.
In addition to participating in drug treatment programs, respondent participated in an after-school tutoring program called "We Have Not Forgotten You." A letter from the organization's program coordinator reflects that respondent began tutoring there in September 1996.
Respondent acknowledged she had misunderstandings with Alberts and Hoy and stated she was concerned with how the system was treating her children. According to respondent, she asked employees of various agencies working in conjunction with DCFS why her children had not been returned to her, but they never had an answer. Respondent got new furniture for her home after DCFS told her she needed a suitable home before her children could be returned.
In October 1998, respondent moved to Belvidere, Illinois, in order to secure overnight visits from another one of her children who was living near there. Respondent explained that she always visited D.H., L.H., and E.H. whenever physically possible and had other children whom she visited as well. Respondent denied she gave her children inappropriate food during visits supervised by Hoy and stated she brought cheeseburgers, chicken, mashed potatoes, and corn to those visits. Respondent noted she had had as much and as frequent telephone contact with her children as possible.
On cross-examination, respondent acknowledged that SEDAC diagnosed her in June 1996 as cocaine dependent. However, she stated that she may have gone to as many as 1,000 AA/NA meetings, never missed a single week of those meetings between 1994 and 1998, and gave documentation confirming her attendance to several social workers, including Colleen Hoy. Respondent also stated she had sent six birthday cards to L.H., none to D.H., and 10 to E.H. since losing custody of them.
At the conclusion of the fitness hearing, the court found by clear and convincing evidence that respondent was unfit to parent L.H., E.H., and D.H. based on: (1) her failure to maintain a reasonable degree of interest, concern, or responsibility for their welfare; (2) her failure to protect them from conditions in their environment injurious to their welfare; (3) her habitual drunkenness and/or addiction to drugs for at least one year immediately prior to the commencement of the unfitness proceeding; and (4) her failure to make reasonable efforts and/or progress during the 12 months following the adjudications of neglect. The court stated that it found Alberts and Hoy to be very credible witnesses and stated that it found respondent totally incredible. In support of its credibility finding regarding respondent, the court noted, among other things, that documents from various drug programs in which she had participated reflected she had given various answers regarding when she first began using cocaine. The court further noted that respondent had produced no documentation to support her testimony that she had attended over 100 NA/AA meetings and submitted to 100 drug tests.
On June 29, 1999, the court conducted a hearing to determine whether termination of respondent's parental rights was in the best interest of L.H., D.H., and E.H. At the time of the hearing L.H. was six years old, D.H. was seven years old, and E.H. was eight years old. The State called two witnesses, Josie Faulkner, a supervisor at *59 Lutheran Social Services, and Aliyah McMillan, case manager at Youth Campus.
Faulkner testified that D.H. and L.H. had been in the same foster home since February 1997 and that she had been assigned to their case since August 1998. Faulkner visited D.H. and L.H. at their foster home approximately once a month and observed them interact with their foster mother, whom they called "mom." D.H. and L.H. went to shows and attended church with their foster mother and also had a good relationship with her 17-year-old son, whom they referred to as their brother. Faulkner also noted that D.H. and L.H. had friends from school who lived in their neighborhood.
With respect to the children's special needs, Faulkner explained that both D.H. and L.H. were in counseling and that D.H. was receiving speech therapy, was enrolled in a special education program at school, and had recently begun taking Ritalin.
Faulkner stated that D.H. and L.H. had a really good relationship with their foster mother, were bonded with her, and were doing fine in their foster home. D.H. and L.H. told Faulkner that they wished to remain in the foster home. Faulkner opined that D.H. and L.H. should remain in foster placement rather than be returned home, but noted that terminating all contact between respondent and D.H. and L.H. would have an adverse impact on them. Although the foster mother was not then ready to adopt, she wanted to keep D.H. and L.H. in her home and had not ruled out adoption as a possibility.
Although Faulkner had only a limited opportunity to see respondent interact with D.H. and L.H., she acknowledged that respondent loved them and they loved her, that they appeared to have missed her, and that they had requested to see respondent. Faulkner noted that D.H. and L.H. called respondent "Wanda" rather than "mom."
Aliyah McMillan, a caseworker for 25 years and case manager for E.H. since 1996, testified she visited E.H. in foster placement every other week. E.H. had been in the same foster home for approximately three years, and her foster mother, a retired computer specialist, was home every day. Although E.H. was very shy when she first arrived at the foster home, she subsequently became very outgoing and attached to her foster mother, her foster mother's two adopted children, and the other foster child living in the home. E.H. enjoyed attending concerts and visiting relatives with her foster family, loved her foster mother, whom she called "mom," and was happy and safe in the home.
McMillan acknowledged that respondent loved her children and was extremely committed to regaining custody of them. McMillan noted that although E.H. had expressed love and affection for respondent, she had become "more silent" and expressed her love "less and less." McMillan stated E.H. wanted to remain in her foster home and opined E.H. should remain there. Although E.H.'s foster mother had not committed to adopting E.H., she told McMillan that adoption could be a possibility in the future.
Two witnesses testified on behalf of respondent, Nelly Amos-Ikoro and Khristina Cook. Amos-Ikoro, a former caseworker with Lutheran Social Services, testified that she was a caseworker for D.H. and L.H. between August 1998 and February 1999. During the six months that Amos-Ikoro worked with the family, she observed two visits between respondent and D.H. and L.H. The children were happy to see their mother, and the interaction was nurturing and caring. Amos-Ikoro stated that when she left the case in February *60 1999, she did not believe respondent's parental rights should be terminated because she had complied with required services. Amos-Ikoro acknowledged, however, that respondent still needed to complete an anger management class at that time. According to Amos-Ikoro, D.H. and L.H. had a very strong bond with respondent and wanted to return home to her. Amos-Ikoro opined that terminating respondent's parental rights would not be in her children's best interest and stated they should eventually be returned home after respondent had submitted to anger management counseling and had completed successful unsupervised visits. On cross-examination, Amos-Ikoro acknowledged that she was discharged from Lutheran Social Services and acknowledged that D.H. and L.H. were bonded to their foster mother.
Khristina Cook, a DCFS child welfare specialist in Rockford, Illinois, was assigned to respondent's family in April 1999, approximately three months before the best interest hearing. Cook testified that respondent moved from Chicago to Belvidere in order to have more support from DCFS.
During the three months before the best interest hearing, Cook saw respondent on a weekly basis. Respondent was cooperative and had four negative urine scans. In May 1999, after reviewing respondent's file, Cook recommended that the goal for respondent's children be changed to return home. Cook had never seen or spoken to D.H., L.H., or E.H. At the best interest hearing, Cook opined that termination of respondent's parental rights would not be in the children's best interests and recommended that the children be returned home immediately. Cook made this recommendation despite the fact that she had never seen or spoken with D.H., L.H., or E.H.
At the conclusion of the hearing, the trial court found that terminating respondent's parental rights was in the best interest of D.H., E.H., and L.H. The court noted that it found Faulkner and McMillan to be credible and honest, that Amos-Ikoro had been fired from Lutheran Social Services, and that Cook had been on the case since only April 1999 and had never seen the children with their mother.
The court recognized the evidence showed respondent loved her children and there was bonding between them. The court further recognized that all four witnesses had concerns about the effect terminating respondent's parental rights would have on D.H., E.H., and L.H.
However, the court also stated:
"[T]he children have ties with their foster families, their foster siblings, their schools that they have been in for a period of time, their church, and their communities. * * * The special needs of these children are all being met by their foster mother and have been met consistently throughout their placement.
* * *
* * * [T]here was no evidence that [respondent] ever inquired about their schooling, their progress in school. There is no evidence she ever inquired about their special needs. There is no evidence that she ever wrote letters to her children in order to maintain contact in place of visitations, no evidence that she phoned them on a regular basis in order to maintain contact with them, or that they wrote letters to her or telephoned her on a regular basis either."

II. PARENTAL UNFITNESS
We first address respondent's argument that the State failed to prove any of the statutory factors supporting its allegation that respondent was an unfit parent. *61 "A finding of unfitness must be based on evidence that is clear and convincing." In re D.J.S., 308 Ill.App.3d 291, 294-95, 241 Ill.Dec. 765, 719 N.E.2d 1168 (1999). After an unfitness finding has been made, it is entitled to great deference and will only be disturbed on appeal if it is against the manifest weight of the evidence. In re D.J.S., 308 Ill.App.3d at 295, 241 Ill.Dec. 765, 719 N.E.2d 1168.
In the instant case, the trial court found respondent unfit based on several statutory grounds, including her failure to make reasonable progress towards the return of her children under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 1996)). When multiple grounds of unfitness have been alleged, a finding that any one allegation has been proved is sufficient to sustain a parental unfitness finding. In re D.J.S., 308 Ill.App.3d at 295, 241 Ill.Dec. 765, 719 N.E.2d 1168. Because we find the evidence sufficient to establish respondent unfit on this statutory basis, we find it unnecessary to discuss the other grounds relied upon by the court.
"`Reasonable progress' is an objective standard that exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the near future, will be able to order the child returned to parental custody." In re J.G., 298 Ill.App.3d 617, 626, 232 Ill.Dec. 720, 699 N.E.2d 167 (1998). When the adjudications of neglect were entered in the instant case, section 1(D)(m) of the Adoption Act provided that a parent's failure to make reasonable progress toward the child's return within 12 months after an adjudication of neglect constituted grounds of unfitness. 750 ILCS 50/1(D)(m) (West 1996). We note that the legislature amended section 1(D)(m) effective June 25, 1997, to reduce the applicable time period from 12 to 9 months. Pub. Act 90-28, eff. June 25, 1997. However, the respondent's conduct in this case must be assessed and measured within the 12-month time period. In re D.L., 191 Ill.2d 1, 10, 245 Ill.Dec. 256, 727 N.E.2d 990 (2000).
The relevant time period to determine whether respondent made reasonable progress toward reunification with D.H. runs from the date of his adjudication, December 2, 1992, to December 2, 1993. A review of the evidence presented at the fitness hearing reveals that respondent did not make reasonable progress during that time. D.H. was born cocaine-exposed. Respondent admitted that when she would use cocaine, she would usually drive herself and the children over to a friend's house, smoke cocaine in the presence of the children, and then drive the children home. After D.H. was born he lived with respondent for approximately four months. In March of 1992, D.H. suffered a facial burn injury while under the care of the maternal grandmother and has not lived with respondent since the burn incident. A client service plan prepared in November 1992, the month before D.H.'s adjudication, provided that respondent was to visit D.H. on a weekly basis, complete a substance abuse program, attend anger management classes, undergo counseling, test negative on drug screening, attend parental training classes, cooperate fully with DCFS and ECFA, and complete a psychological evaluation and follow through with all recommendations. An evaluation of that service plan dated May 16, 1994, indicated that respondent did not maintain regular visits with D.H. and often failed to confirm visits. In fact, a transfer report dated July 1993 stated that respondent visited D.H. only twice between the time he was adjudicated neglected in December *62 1992 and July 1993. A progress report prepared by an ECFA caseworker indicated that from November 4, 1993, to February of 1994, respondent only visited D.H. five times. Both Alberts and Hoy testified that respondent's visitation with the children after they were removed from her custody was sporadic and inconsistent. With the exception of a parenting class that respondent completed in 1993, she failed to successfully complete any other services offered to her by DCFS or ECFA.
In June 1993, respondent began an outpatient drug treatment offered by the Brass Foundation, where she was diagnosed as cocaine dependent. However, she quit the program on August 23, 1993. In its "Closing Summary," the Brass Foundation stated that respondent began using cocaine at age 15 and was currently using one $10 bag per day and was currently drinking two to three pints of wine and two to six pints of beer per day. The summary gave respondent a "poor" prognosis because she did not complete any of the goals in the treatment plan, including family counseling, abstaining from drugs, obtaining her GED, and fulfilling the treatment agreement of 15 hours per week.
We recognize that respondent completed a parenting class in August 1993 and that documents introduced at the fitness hearing showed that respondent underwent a mental health assessment on July 19, 1993, and attended a subsequent appointment with a therapist. However, respondent missed her following appointment and failed to ever contact her therapist to schedule subsequent appointments. December of 1993 was the one year marker for her to make reasonable progress toward reunification with D.H. At that time respondent was not in treatment and had only visited D.H. sporadically during the relevant period. Based on this record we conclude the trial court properly found that respondent failed to make reasonable progress toward D.H.'s return within the subject time frame.
The relevant time period to determine whether respondent made reasonable efforts toward reunification with L.H. and E.H. runs from August 3, 1995, the date of their adjudication of neglect, to August 3, 1996. As in D.H.'s case, the evidence presented at the fitness hearing showed that respondent did not make reasonable progress.
At the August 3, 1995 hearing, the court suspected that respondent was under the influence and ordered respondent to submit to a urine scan, the respondent refused to comply. An April 30, 1996, evaluation of the November 1995 visitation and client service plans prepared by Colleen Hoy reflected that respondent made only two out of seven visits offered between August 1995 and March 1996, failed to provide documentation verifying AA/NA attendance, and failed to engage in counseling despite the recommendation made after she underwent a psychological evaluation at the Academy for Counseling in January 1996. Similarly, a November 6, 1996, evaluation of the May 1996 client service plan reflected that respondent had not submitted documentation verifying her attendance at AA/NA meetings and refused to undergo a bonding assessment which was offered to her in March 1996. In November 1996 she refused psychotropic medication that was recommended to her.
Both ECFA case workers Alberts and Hoy testified that respondent's visitation with the children after they were removed from her custody was sporadic and inconsistent. Respondent contends that her failure to visit her children more often was due to reluctance on the part of caseworkers to schedule visits due to the long drive required to effectuate the visits. We are *63 mindful that there were some problems on the part of the DCFS in coordinating services for this family and a DCFS caseworker was in fact fired for inconsistency in servicing this family. Regarding respondent's visitation, however, we note respondent did not move to Belvidere until October of 1998. This is outside of the twelve month statutory time period for D.H., L.H. and E.H. Moreover, the record reflects sporadic and inconsistent visitation with the children before the move to Belvidere became a factor and during the statutory relevant time periods. In addition to DCFS, ECFA took the responsibility of assisting respondent with services and were involved with respondent since 1992.
We note that respondent only sporadically exercised her visitation with the children when she lived in Chicago despite the fact that ECFA case workers Alberts and Hoy offered her visitation in person, over the telephone, and through letters. Both case workers also indicated that respondent acted inappropriately during visits with the children and that she was sometimes belligerent, verbally abusive, and under the influence of drugs or alcohol. Caseworker Alberts met with respondent in September of 1995 and specifically explained what reunification programs respondent had to complete. On November 2, 1995 the goals for E.H., L.H. and D.H. were changed to long-term foster care because respondent had not visited the children since July and had not completed services, other than parenting class. Respondent had been encouraged to visit the children, however, the service plan from May 1996 indicated two visits by respondent in seven months. None of these visits were unsupervised because of respondent's lack of consistency and compliance. In January of 1996 her psychological evaluation indicated that respondent lacked consistency in all areas of her life.
The "Treatment Summary" dated February 19, 1998, prepared by SEDAC indicates that respondent was admitted there for treatment on June 26, 1996. At that time respondent admitted to using cocaine in May 1996 and alcohol in June 1996. The treatment summary reflected that respondent attended about 3 out of 4 group sessions a month, left group counseling in December 1996, began individual counseling in January 1997 and was making progress. Up until the SEDAC "Summary" from February 1998 respondent consistently lacked follow-through for any of the services made available to her. Thus, although respondent began a drug treatment program within the applicable 12-month period, she did not begin to make any progress until after that period had expired. Based on the totality of the evidence, we hold that the trial court's determination that respondent failed to make reasonable progress towards the return of D.H., E.H., and L.H. was not against the manifest weight evidence.

III. TERMINATION OF PARENTAL RIGHTS
Respondent next argues that it was not in the best interests of D.H., L.H., and E.H. to terminate her parental rights. We are mindful that parental rights are of deep human importance and must not be lightly terminated. In re Dawn H., 281 Ill.App.3d 746, 217 Ill.Dec. 396, 667 N.E.2d 485 (1996). A primary goal of the juvenile court act is to preserve and strengthen minor's family ties whenever possible. 705 ILCS 405/1-2(1) (West 1998). With these principles in mind we address the termination of respondent's parental rights.
After a parent has been found unfit, the decision regarding whether to terminate that parent's rights must be based on the child's best interests. In re *64 D.J.S., 308 Ill.App.3d at 295, 241 Ill.Dec. 765, 719 N.E.2d 1168. A finding that termination of parental rights is in the child's best interests will not be reversed absent an abuse of discretion by the trial court. In re D.J.S., 308 Ill.App.3d at 295, 241 Ill.Dec. 765, 719 N.E.2d 1168. When determining whether termination of parental rights is in a child's best interests, the court is to consider the following factors in the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the development of his identity; (3) his background and ties, including familial, cultural, and religious; (4) his sense of attachments; (5) his wishes; (6) his community ties; (7) his need for permanence, including his need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05)(a) through (j) (West 1998).
The evidence in this case indicated that D.H. was seven years old, had not lived with respondent since he was less than one year old and had since his birth lived with respondent for a total of approximately four months. L.H. was six years old and had not lived with respondent since she was less than two years old. Both D.H. and L.H. had been in the same foster home for over two years, were bonded with their foster mother, told Faulkner they wanted to remain in their foster home, and had friends from school living in their neighborhood. D.H. receives speech therapy and has individual counseling sessions every week. In addition, D.H. has been diagnosed with attention deficit disorder and hyperactivity and has been placed in special education classes. L.H. is also in counseling and speech therapy, but she has been mainstreamed at school. The special needs of D.H. and L.H. have been addressed by their foster mother. Although their foster mother had not committed to adopting them at the time of the best interest hearing, she wanted to keep them in her home and indicated that adoption could be a possibility in the future.
We note that while this case was pending respondent on June 12, 2000, brought a motion to stay the adoption proceeding regarding D.H. and L.H. in the circuit court pending the outcome of this appeal. This court denied that motion on June 27, 2000, and on June 30, 2000, the circuit court entered a judgment order for adoption as to D.H. and L.H. Nothing we say in this opinion is to be interpreted as addressing the legal propriety of the adoption proceeding moving forward while this court resolved respondent's appeal of her parental rights termination.
E.H. was eight years old at the time of the best interest hearing, had been in the same foster home for approximately three years, and had become far more outgoing during the time she had been living there. E.H. is enrolled in special education classes at school and has individual counseling weekly. The special needs of E.H. have been addressed by her foster mother. E.H. loved her foster mother and called her "mom," enjoyed participating in activities with the other children in the family, was happy and safe in her foster home, and told McMillan that she wanted to remain there. Although E.H.'s foster mother had not committed to adopting her at the time of the best interest hearing, she loved her, was committed to providing her with permanency, and indicated that adoption could be a possibility in the future.
Finally, while we recognize that the testimony at the best interest hearing reflected that respondent loved E.H., D.H., and L.H., and that they, in turn, loved her, *65 we emphasize that the testimony of Faulkner and McMillan, who had the most significant interaction with the children, reflected that the children also loved their foster mothers, had developed bonds with their respective foster families, and wanted to remain with those families. E.H., D.H., and L.H. are entitled to a stable secure home environment.
Accordingly, for the reasons previously discussed, we hold that the circuit court's termination of respondent's parental rights with respect to D.H., L.H., and E.H. did not constitute an abuse of discretion.
The judgment of the circuit court is affirmed.
Affirmed.
McNULTY, P.J., and COHEN, J., concur.