NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 200511-U

NOS. 4-20-0511, 4-20-0512 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 8, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.C., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 18JA252 |
| v.  (No. 4-20-0511) | ) | |
| Michelle C., | ) | |
| Respondent-Appellant). | ) | |
| ------------------------------------------------------------- | ) | |
| *In re* L.C., a Minor | ) | No. 18JA253 |
| | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.  (No. 4-20-0512) | ) | Honorable |
| Michelle C., | ) | Karen S. Tharp, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, concluding the trial court's fitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2     On September 11, 2020, the trial court terminated the parental rights of respondent, Michelle C., as to her children, A.C. (born December 27, 2011) and L.C. (born December 27, 2011).  Respondent father, Jared C., is not a party to this appeal.  On appeal, respondent argues the trial court's fitness and best-interest findings were against the manifest weight of the evidence.  For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. Initial Proceedings

¶ 5                                        1. *A.C.*

¶ 6          In December 2018, the State filed a petition for adjudication of wardship, alleging A.C. was neglected where (1) the minor's environment was injurious to her welfare as evidenced by respondent's drug use (705 ILCS 405/2-3(1)(b) (West 2018)) and (2) the minor was not receiving the proper care and supervision necessary for her well-being in that respondent failed to make a proper care plan for the minor's supervision (705 ILCS 405/2-3(1)(a) (West 2018)). Subsequently, the trial court placed A.C. in shelter care and granted the Department of Children and Family Services (DCFS) temporary custody and guardianship of A.C.

¶ 7          In March 2019, the trial court entered an adjudicatory order finding A.C. neglected after respondent stipulated to paragraph two of the petition for wardship: A.C. was not receiving the proper care and supervision necessary for her well-being in that respondent failed to make a proper care plan for A.C.'s supervision. The State withdrew paragraph one per the stipulation. In a May 2019 dispositional order, the trial court (1) found respondent unfit, (2) made A.C. a ward of the court, and (3) granted DCFS guardianship and custody.

¶ 8                                        2. *L.C.*

¶ 9          In December 2018, the State filed a petition for adjudication of wardship, alleging L.C. was neglected where (1) the minor's environment was injurious to her welfare as evidenced by respondent's drug use (705 ILCS 405/2-3(1)(b) (West 2018)) and (2) the minor was not receiving the proper care and supervision necessary for her well-being in that respondent failed to make a proper care plan for the minor's supervision (705 ILCS 405/2-3(1)(a) (West 2018)).

Subsequently, the trial court placed L.C. in shelter care and granted DCFS temporary custody and guardianship of L.C.

¶ 10　　　　In March 2019, the trial court entered an adjudicatory order finding L.C. neglected after respondent stipulated to paragraph two of the petition for wardship: L.C. was not receiving the proper care and supervision necessary for her well-being in that respondent failed to make a proper care plan for L.C.'s supervision. The State withdrew paragraph one per the stipulation. In a May 2019 dispositional order, the trial court (1) found respondent unfit, (2) made L.C. a ward of the court, and (3) granted DCFS guardianship and custody.

¶ 11　　　　　　　　　　　B. Termination Proceedings

¶ 12　　　　In January 2020, the State filed petitions to terminate respondent's parental rights. The petitions alleged respondent failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to A.C. and L.C. (750 ILCS 50/1(D)(b) (West 2018)); (2) make reasonable efforts to correct the conditions that were the basis of removal (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) make reasonable progress toward the return of A.C. and L.C. within nine months after an adjudication of neglect, specifically March 27, 2019, to December 27, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)). In August 2020, the State filed amended petitions to terminate respondent's parental rights. The amended petitions alleged respondent failed to make reasonable efforts to correct the conditions that were the basis of removal of A.C. and L.C. from her within nine months after an adjudication of neglect, specifically March 27, 2019, to December 27, 2019.

¶ 13　　　　　　　　　　　　1. *Fitness Hearing*

¶ 14　　　　On September 11, 2020, the trial court conducted a bifurcated hearing on the petitions for termination of parental rights, first considering respondent's fitness.

- 3 -

¶ 15    Before the State called its first witness, respondent's attorney made a motion to continue the hearing, citing respondent's absence. Respondent's attorney informed the trial court respondent was not present at the prior court hearing where the court set the termination hearing date. Although counsel had been unable to reach respondent prior to the hearing date, the State notified respondent by publication. Eventually, on the morning of the termination hearing, respondent's attorney did reach respondent who said "she was at work and that she didn't know if she was going to be able to make it." After going back through the file, the court denied the motion finding respondent had "a history of not showing up for court." During the hearing, the parties presented the following relevant testimony.

¶ 16                           a. Punam Deshmukh

¶ 17    Punam Deshmukh, a case worker at Lutheran Child and Family Services (LCFS), testified she served as the caseworker on respondent's case from December 2018 to late June or early July 2019. Deshmukh acknowledged A.C. and L.C. were removed from respondent due to allegations of neglect, specifically respondent "was never around to supervise them." Deshmukh created a service plan for respondent in January 2019. Respondent's service plan required substance-abuse treatment, domestic-violence and anger-management counseling, parenting classes, cooperation with the agency, stable housing and employment, mental-health services, and visitation with the children. Deshmukh made all the necessary referrals for respondent. Deshmukh testified she was not present for the first annual case review meeting on respondent's service plan.

¶ 18    Deshmukh testified respondent failed to cooperate with her substance-abuse services. Respondent only completed 3 out of 16 substance-abuse classes and provided only a third of the requested drug drops. Respondent failed to comply with her domestic-violence

- 4 -

services where she never attended a domestic-violence counseling session. Deshmukh informed respondent she needed to go to Memorial Medical Center for a mental-health assessment. Deshmukh testified, "I think [respondent] went to her [mental-health] assessment, but I'm not sure what happened after that."

¶ 19 Respondent failed to maintain contact or provide her home address to Deshmukh. Due to a lack of attendance, respondent failed to complete parenting classes and was discharged from parenting classes in June 2019. While respondent indicated she was employed, she never provided Deshmukh proof of employment.

¶ 20 Deshmukh testified respondent's visitation schedule included weekly supervised visits with the children. Visitation occurred in public. Deshmukh supervised many of respondent's visits with the children. Respondent's participation in visitation was "very spotty." Respondent missed at least 50% of the visits. Deshmukh testified respondent missed visits because of "work, she wasn't feeling good, stuff like that." Respondent frequently cancelled visits at the last minute. Respondent also routinely failed to show up to rescheduled visits.

¶ 21 Throughout her visits respondent regularly discussed the case in front of the children despite repeated direction to not mention the case while visiting. In addition, respondent frequently talked on the telephone with friends during visits. Deshmukh provided that the overall interaction between respondent and the children was "okay." Respondent never sent cards, letters, or gifts to the children. Deshmukh testified the foster parents did not want respondent to have their address. Respondent provided food for the children at visits. Deshmukh testified she was never close to returning the children to respondent because respondent "wasn't cooperating with services."

¶ 22 b. Amber Parker

¶ 23    Amber Parker, a case worker at LCFS, testified she served as the caseworker on respondent's case from August 2019 to November 2019. In August 2019, when Parker entered the case, a service plan had been developed in January 2019. Six months later, in May 2019, another service plan went into effect. Parker testified respondent's service plan included "DCFS/LCFS parenting classes, visitation with her children, substance[-]abuse services, domestic[-]violence services/anger management and counseling services." Respondent's visitation schedule also provided respondent with supervised visitation with the children once a week. Parker made the necessary referrals for services.

¶ 24    Parker testified respondent "cooperated with five out of seven toxicology screenings, which were negative, but she only completed three out of 16 classes while I had the case, and she was told that if she did not continue the service, that she would be let go out of the service, basically." Respondent failed to complete domestic-violence services, mental-health services, or parenting classes. Parker testified, "[Respondent] stayed in communication with [her] often. I spoke with her at least four times a month, but she would not provide any employment details. She would say where she worked but did not want to tell us or give any paycheck stubs to confirm." Parker stated "even though [respondent] communicated a lot, it was always usually hostile communication." Parker engaged in monthly in-person visits with respondent and Parker did a home safety inspection of respondent's home when she lived with a paramour, Julius. Parker testified Julius underwent a background check and he expressed a willingness to engage in an assessment to determine if he needed services. However, the case transferred to Rutledge Youth Foundation (Rutledge) before an assessment occurred.

¶ 25    Parker occasionally supervised respondent's visitation with her children. While respondent's home with Julius was cleared for supervised visitation with the children, visitation

continued to occur in public. Parker testified respondent regularly discussed the case in front of the children despite repeated direction not to mention the case during visits. Respondent also tried to accompany the children to the bathroom by herself, which was not allowed. Parker acknowledged respondent and the children had a good bond and relationship. Respondent visited with the children once a month even though she was allowed three to four visits a month. Respondent regularly missed visits and was placed on "call and confirm" status, meaning she was required to call 24 hours before a visit to confirm the visit in order to have a visit. This allowed the agency to avoid picking up the children and taking them to a visit only to have the respondent fail to appear. In the past, when the children were picked up and respondent did not show, the children exhibited significant behavioral issues. Respondent blamed missed visits on work or her phone being dead. Parker testified "[t]he majority of the time she just didn't reach out." Respondent never sent cards, letters, or gifts to the children. Parker testified she was never close to returning the children to respondent because "[t]here was no progress in her services, so we cannot move forward with that yet."

¶ 26        Parker's involvement in the case ended in November 2019 when the case transferred to Rutledge. The transfer occurred due to a conflict of interest where "somebody within LCFS was related to somebody involved in the case." Parker established a new service plan, with no changes, prior to the November 2019 transfer to Rutledge. Respondent did receive another referral for parenting classes where respondent was previously removed for failure to participate.

¶ 27                              c. Margaret Perry

¶ 28        Margaret Perry, a foster care supervisor at Rutledge, testified she served as the supervisor on A.C.'s and L.C.'s case from January 2020 until the present. Perry established a

- 7 -

service plan for respondent for December 2019 to May 2020. The service plan required mental-health services, substance-abuse treatment, parenting classes, domestic-violence counseling, cooperation with the agency, and visitation. Perry made the necessary referrals for respondent's services.

¶ 29        Perry testified that at a May 2020 annual review of respondent's service plan, respondent was rated unsatisfactory. In January 2020, Perry received information respondent provided negative drug drops in September 2019 and October 2019. However, respondent failed to attend substance-abuse services, and the Family Guidance Center discharged her from services due to failure to engage. In February 2020, Family Guidance Center recommended respondent engage in more intensive substance-abuse services. Respondent never engaged in the more intensive services. Perry testified she knew of no financial issues preventing respondent's engagement in drug treatment. According to Perry, the agency or DCFS could provide financial assistance if a parent shows they lack sufficient resources.

¶ 30        Respondent failed to attend domestic-violence services, mental-health services, and in-person and virtual parenting classes. Perry testified respondent inconsistently maintained contact with her. In describing their contact, Perry stated, "I spoke to her personally myself about every three months. Those conversations, respondent was typically screaming and yelling, and at times appeared to be under the influence due to her speech. The caseworker had tried to reach out to her and had similar responses." Respondent also failed to provide proof of employment and never disclosed her home address. Perry testified respondent "was reported to have been living with a paramour named Julius."

¶ 31        Respondent's visitation schedule with the children changed from once a week to once a month. Perry testified respondent only engaged in 2 out of 25 visits. Those visits took

place on December 10, 2019, and February 4, 2020. Both visits occurred in the community. During the first visit, respondent purchased gifts for the children. Respondent provided various reasons for missing visits but generally it was due to respondent not feeling well. Perry never supervised visits with respondent and the children. Perry testified she was never close to returning the children to respondent because of respondent's "[f]ailure to engage in services and failure to engage in visitation with her children."

¶ 32 Perry testified she had no contact with respondent between January 2020 and April 2020. Perry tried to reach respondent but respondent "had inconsistent phone numbers throughout the duration of the case."

¶ 33                                             d. Trial Court's Findings

¶ 34 After hearing the evidence, the trial court found, by clear and convincing evidence, respondent unfit on three separate grounds. When ruling on the petition, the court stated,

> "So while with [LCFS], she was engaged in, I kind of saw
> the substance abuse as being the main issue that she would need to
> address. She was engaged at various times but never successfully
> completed substance[-]abuse treatment. Clearly, by the end of the
> nine-month period, in December, which was about the time then
> that she was unsuccessfully discharged, she tried to get engaged
> again after that and was again unsuccessfully discharged, was
> recommended for even a higher level of treatment, never did that,
> never engaged, certainly never completed any of the other services.

Dropping negative, again, she was dropping at the Family Guidance Center, which is only when she bothered to show up.

I agree with [the guardian *ad litem*], that probably the most disturbing is the lack of visitation she was having. The visits went well. Obviously, she yelled and those things, but other than that, the kids enjoyed them. She missed over half of them at [LCFS], and then once it did transfer to Rutledge, she only managed to make two, hasn't had one since February.

So clearly, she has failed to maintain a reasonable degree of interest, concern[,] or responsibility, has not made reasonable efforts or reasonable progress during the specific nine-month period of time ending in December of '19."

¶ 35                                 2. *Best-Interest Hearing*

¶ 36          Immediately following the fitness hearing, the trial court held a separate best-interest hearing. Respondent's attorney renewed the motion to continue which the court denied. The court then heard the following evidence.

¶ 37                                 a. Margaret Perry

¶ 38          Perry testified that in June 2019, A.C. and L.C. were placed in foster care with respondent's cousin. The foster mother met all their medical, educational, and social needs. Perry expressed no concerns regarding the foster placement and testified the children were attached to the foster mother. The children felt safe with the foster mother and expressed they wanted to stay with the foster mother. Perry testified the foster mother was willing to provide permanency through adoption.

¶ 39          Perry described the attachment between the children and respondent as "[t]here isn't really one at all."  The last visitation with respondent and the children occurred in February 2020, and following visits, the children displayed behavioral issues.  Perry testified it was in the best interests of the children to terminate respondent's parental rights because,

> "[t]he parents have not made any efforts to maintain a relationship with the children, and the children are very stable in their current housing with [the foster mother], who is able to make sure that they are enrolled in school and that they are participating in educational activities, such as Girl Scouts, and she is making sure that she is following all the doctor's medical recommendations as the girls have been diagnosed with [attention deficit/hyperactivity disorder (ADHD)]."

¶ 40          Counsel asked if Perry discussed with the foster mother if she would be willing to allow either parent to interact with the children going forward even if their parental rights were terminated.  Perry responded, "I believe that if [m]om and [d]ad were safe and appropriate to have contact with the children, she would make a judgment call at that time as to whether or not it was in the girls' best interest."  The foster mother did not indicate respondent had ever contacted her over the life of the case.

¶ 41          On cross-examination, Perry testified the current placement was the second placement for the children.  The first foster placement asked for a transfer because respondent harassed the family.

¶ 42                          b. Trial Court's Findings

- 11 -

¶ 43    After hearing the evidence, the trial court found it was in A.C.'s and L.C.'s best interests to terminate respondent's parental rights. Specifically, the court stated,

"All right, going through all the best interest factors, it does appear that the children are, at this time, safe and secure. They have been in this home for a substantial period of time. Their needs are being met. They have said that they want to stay there. While they don't probably understand necessarily the issue of adoption, they said they want to stay there and don't want to leave.

The probability that either parent would, at this point, step up and do what they needed to do does not seem at all likely. Oftentimes what turns on the biggest issue for the [c]ourt is the ability to obtain permanence for the children. It would appear that the best way to obtain permanence for them is to allow them to be adopted. As the foster parent has stated, she is willing to adopt.

So, at this time, I do find that the State has shown by a preponderance of the evidence that it is in each minor's best interest that the parental rights of [respondent] *** be terminated so that they may obtain that permanence through adoption.

DCFS will remain as guardian and custodian of the minors. DCFS will now have the power to consent to adoption should anyone desire to adopt. That consent will be binding upon [respondent] *** without any other notice to them or consent by them."

- 12 -

¶ 44     Accordingly, the court entered an order terminating respondent's parental rights.

¶ 45     This appeal followed.  We docketed respondent's appeal in regard to A.C. as No. 4-20-0511 and respondent's appeal in regard to L.C. as No. 4-20-0512.  We have consolidated respondent's cases for review.

¶ 46                              II. ANALYSIS

¶ 47     On appeal, respondent argues the trial court erred in finding her unfit and determining it was in A.C.'s and L.C.'s best interests to terminate her parental rights.  We address these arguments in turn.

¶ 48                           A. Fitness Finding

¶ 49     In a proceeding to terminate parental rights, the State has the burden of proving parental unfitness by clear and convincing evidence.  *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004).  In deciding fitness, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)).  Evidence of unfitness based on any ground enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) is enough to support a finding of unfitness.  *In re C.W.*, 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1113 (2002).  A reviewing court will not overturn the trial court's finding of unfitness unless it is against the manifest weight of the evidence.  *Jordan V.*, 347 Ill. App. 3d at 1067.  The trial court's decision is given great deference due to "its superior opportunity to observe the witnesses and evaluate their credibility."  *Id.*

¶ 50     The trial court found respondent unfit where respondent failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to A.C. and L.C. (750 ILCS 50/1(D)(b) (West 2018)); (2) make reasonable efforts to correct the conditions that were the basis

- 13 -

of removal within nine months after an adjudication of neglect, specifically March 27, 2019, to December 27, 2019 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) make reasonable progress toward the return of A.C. and L.C. within nine months after an adjudication of neglect, specifically March 27, 2019, to December 27, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 51 The trial court's finding respondent failed to make reasonable progress toward the return of the children within nine months following the adjudications of neglect was not against the manifest weight of the evidence. Reasonable progress is measured by an objective standard that considers the progress made toward the goal of returning the child to the parent. *In re M.A.*, 325 Ill. App. 3d 387, 391, 757 N.E.2d 613, 617 (2001). Specifically, reasonable progress includes a parent's compliance with service plans and court directives, in light of the condition that gave rise to the removal of the child. *In re C.N.*, 196 Ill. 2d 181, 216, 725 N.E.2d 1030, 1050 (2001).

¶ 52 During the relevant time period (March 27, 2019, to December 27, 2019), respondent's service plans called for (1) substance-abuse treatment; (2) domestic-violence and anger-management counseling; (3) parenting classes; (4) cooperation with the agency; (5) stable housing and employment; (6) mental-health services; and (7) visitation with the children. The evidence established respondent never completed substance-abuse treatment where she only attended 3 out of 16 substance-abuse classes and was eventually dropped from the class for failure to attend. While Perry received information in January 2020 that respondent provided negative drug drops in September 2019 and October 2019, respondent only provided a third of the requested drug drops.

¶ 53 Respondent failed to complete domestic-violence and anger-management services, mental-health services, and parenting classes. Respondent also failed to maintain

- 14 -

(1) consistent contact with her caseworkers and (2) stable housing. While respondent indicated she was employed, she never provided proof of employment.

¶ 54        The evidence further established respondent missed at least half of her supervised visits with her children. Respondent only engaged in visitation with the children once a month even though she was allowed three or four visits a month. Eventually, respondent was placed on "no call/show" status where she was required to call 24 hours before a visit to confirm her visits because her absences caused harm to the children. Also, respondent failed to attend rescheduled visits. When respondent did visit, she regularly talked about the case in front of the children despite repeated instruction to not discuss the case during visits. Respondent also chose to speak on the telephone with friends during the visits. Respondent did exhibit a bond with the children and occasionally provided food and gifts for the children at visits. However, she never sent cards, letters, or gifts to the children. Caseworkers and the supervisor who testified all maintained they were never close to returning the children to respondent because she failed to cooperate and progress with her services.

¶ 55        Given respondent's failure to complete the required service plans, we cannot say the trial court's determination respondent failed to make reasonable progress toward having A.C. and L.C. returned to her care within nine months following the adjudication of neglect was against the manifest weight of the evidence. Because we have upheld the trial court's findings as to one ground of unfitness, we need not review the other grounds. See *In re D.H.*, 323 Ill. App. 3d 1, 9, 751 N.E.2d 54, 61 (2001).

¶ 56                              B. Best-Interest Finding

¶ 57        Once the trial court determines a parent to be unfit, the next stage is to determine whether it is in the best interest of the minor to terminate parental rights. *In re Jaron Z.*, 348 Ill.

App. 3d 239, 261, 810 N.E.2d 108, 126 (2004). The State must prove by a preponderance of the evidence termination is in the best interest of the minor. *Id.* The trial court's finding will not be overturned unless it is against the manifest weight of the evidence. *Id.* at 261-62. In making a best-interest determination, the trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018)).

¶ 58 The State argues respondent failed to make any argument regarding the trial court's finding termination of parental rights was in A.C.'s and L.C.'s best interest. Thus, respondent should be deemed to have forfeited this claim of error. See *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1052, 796 N.E.2d 1175, 1184 (2003); *In re Gregory G.*, 396 Ill. App. 3d 923, 928, 920 N.E.2d 1096, 1100 (2009); *In re Dave L.*, 2017 IL App (1st) 170152, ¶ 22, 80 N.E.3d 694.

¶ 59 We note that according to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), "[p]oints not argued are forfeited and shall not be raised in the reply brief[.]" A review of respondent's opening brief reveals she neglected to present any argument regarding the trial court's finding termination of parental rights was in A.C.'s and L.C.'s best interest. At the end of the brief, respondent asserts, "It is well established that a [r]eviewing [c]ourt will not reverse a [t]rial [c]ourt's finding of unfitness and that termination was in the best interest of the children. [*In re A.P.*, 277 Ill. App. 3d 592, 598, 668 N.E.2d 1006, 1010 (1996)]." Respondent further states, "The [c]ourt's finding that the [a]ppellant/[m]other was unfit and the [c]ourt's order finding that the termination of parental rights was in the children's best interest is a decision against the manifest weight of the evidence. As such, the [t]rial [c]ourt's [o]rder should be reversed and remanded by this [r]eviewing [c]ourt." Respondent failed to file a reply brief.

¶ 60        Although respondent asserts the trial court's best-interest finding was against the manifest weight of the evidence and prays that we reverse the court's best-interest determination, she fails to present any argument in support thereof.  Respondent's conclusory statement, without any supporting analysis, is insufficient to satisfy Rule 341(h)(7).  Therefore, respondent's claim is forfeited.

¶ 61        Even if respondent had properly raised this issue on appeal, the evidence presented at the best-interest hearing overwhelmingly supported the trial court's finding that the termination of parental rights was in A.C.'s and L.C.'s best interest.  Here, after considering the best-interest factors, the trial court properly concluded termination to be in the minor's best interest.  A.C. and L.C. had been in their foster home for a substantial period of time.  The children were reportedly safe and secure, and their needs were being met in their current placement.  The children and the foster mother exhibited a bond and the children expressed their desire to stay with their foster mother.  The court noted the critical importance of obtaining permanence for the children.  The foster mother was willing to provide permanency through adoption.

¶ 62        Conversely, respondent failed to (1) complete services, (2) maintain consistent visitation with the children where her last visit with the children occurred in February 2020, and (3) provide stability and permanence for A.C. and L.C.

¶ 63        Accordingly, we conclude the trial court's finding it was in A.C.'s and L.C.'s best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 64                                III. CONCLUSION

¶ 65        For the foregoing reasons, we affirm the trial court's judgment.

¶ 66           Affirmed.