NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190610-U

NO. 4-19-0610

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 30, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.R., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County |
| Petitioner-Appellee, | ) | No. 17JA65 |
| v. | ) | |
| Shamarcus R., | ) | Honorable |
| Respondent-Appellant). | ) | |
| | ) | Thomas M. O'Shaughnessy, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Knecht and Turner concurred in the judgment.

**ORDER**

¶ 1      *Held*: The appellate court affirmed, concluding the trial court's fitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2      In March 2019, the State filed a petition to terminate the parental rights of respondent, Shamarcus R., as to T.R. (born August 10, 2010). Respondent mother is not a party to this appeal. Following a June 2019 hearing, the trial court found the State proved by clear and convincing evidence respondent failed to (1) maintain a reasonable degree of concern or responsibility for T.R.'s welfare, (2) make reasonable efforts to correct the conditions that were the basis for removal within a nine-month period following adjudication of neglect, and (3) make reasonable progress within that same nine-month period. The following month, the court found it in T.R.'s best interest to terminate respondent's parental rights.

¶ 3 Respondent appeals, asserting the trial court's fitness and best-interest findings were against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 4 I. BACKGROUND

¶ 5 A. Initial Proceedings

¶ 6 In November 2017, the State filed a petition for adjudication of neglect, alleging T.R. was (1) neglected in that his environment was injurious to his welfare because respondent had a history of domestic violence (705 ILCS 405/2-3(1)(b) (West 2016)) (count I), (2) abused in that respondent inflicted or allowed to be inflicted on the minor physical injury by other than accidental means (705 ILCS 405/2-3(2)(i) (West 2016)) (count II), and (3) abused in that he was at substantial risk of physical injury by other than accidental means (705 ILCS 405/2-3(2)(ii) (West 2016)) (count III). In January 2018, the trial court entered an adjudicatory order finding T.R. abused or neglected, pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3 (West 2016)), based on all three counts in the petition. In April 2018, the court entered a dispositional order making T.R. a ward of the court and granting custody and guardianship to the Department of Children and Family Services (DCFS). This court affirmed the trial court's adjudicatory and dispositional rulings. *In re T.R.*, 2018 IL App (4th) 180279-U.

¶ 7 B. Fitness Proceedings

¶ 8 In March 2019, the State filed a petition to terminate respondent's parental rights, alleging respondent failed to (1) maintain a reasonable degree of interest, concern, or responsibility for T.R.'s welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) make reasonable efforts to correct the conditions that were the basis for T.R.'s removal within nine months, specifically from May 13, 2018, to February 13, 2019, after the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) make reasonable progress toward T.R.'s return within the

same nine-month period (750 ILCS 50/1(D)(m)(ii) (West 2018)).  In June 2019, the trial court held a fitness hearing and heard the following evidence.

¶ 9                                     1. *Sofia Dumlao*

¶ 10          Sofia Dumlao testified she was a caseworker assigned to the case from January 2018 to September 2018.  According to Dumlao, respondent completed an integrated assessment that was used to recommend services including substance-abuse treatment, domestic-violence treatment, individual therapy, psychological evaluation, parenting classes, psychiatric evaluation, family therapy, and compliance with probation.  A May 2018 service plan recommended parenting education, housing and financial independence, cooperation, and substance-abuse treatment.  According to Dumlao, those were the services respondent needed to begin with. Dumlao testified respondent engaged in some of the services, including parenting classes. However, Dumlao recommended respondent engage in anger management before he could complete the parenting classes because he was not using skills taught in the parenting classes during visitation.

¶ 11          When Dumlao was the caseworker, respondent had weekly supervised visits. Respondent attended visits until he had issues with transportation.  The agency paid for bus tokens, but respondent failed to pick up the tokens and missed visits.  Dumlao testified, "And then towards the end, I know the child refused to attend the visitation, so we put everything on hold for a little bit."  According to Dumlao, visits were suspended sometime between March 2018 and April 2018.  Respondent was aware he needed to complete anger management before he completed parenting services, but he failed to attend the anger management treatment. According to Dumlao, respondent threatened T.R. during visits and got mad at T.R., causing

T.R. to hide behind the case aide worker. Dumlao testified T.R. was obviously afraid of respondent.

¶ 12 Respondent had adequate housing but made no progress toward financial independence as he remained unemployed. Respondent also failed to maintain consistent contact with Dumlao or attend administrative case reviews. Respondent completed the integrated assessment and signed the necessary consent forms. Respondent failed to report any instances of relapse to Dumlao, although he reported active marijuana use to his probation officer and the substance-abuse treatment staff. Respondent refused to complete drug tests required by his service plan. The trial court took judicial notice of respondent's unsuccessful discharge from probation in Vermilion County case No. 16-CF-509. Dumlao testified respondent's contact with her and participation in services did not improve while she was the assigned caseworker.

¶ 13 2. *Kelly Cooper*

¶ 14 Kelly Cooper was assigned the case from September 2018 to January 2019. A December 2018 service plan listed respondent's progress in demonstrating skills learned in parenting classes during visits as unsatisfactory. While respondent continued to attend parenting sessions, Cooper was unable to evaluate his progress due to his lack of contact. In September 2018, Cooper mailed respondent a letter asking him to contact her as the new caseworker. Cooper did not hear from respondent until late October when they arranged to meet on November 1, 2018. Respondent failed to attend the November meeting.

¶ 15 The December 2018 service plan recommended respondent attend individual counseling. However, he reported his inability to attend the counseling services because he lacked a medical card. Counseling was available to him through Crosspoint without a medical card. Part of the individual counseling service required respondent participate in a mental-health

assessment at Crosspoint. Respondent was rated unsatisfactory because he failed to contact and schedule an intake assessment at Crosspoint. Respondent began anger-management treatment in January 2018 through New Directions Treatment Center (New Directions). However, respondent did not complete a domestic-violence assessment because New Directions recommended individual counseling first. Respondent continued to deny causing T.R.'s injuries.

¶ 16        Cooper testified respondent's visits with T.R. were suspended in April 2018. Before reinstating visits, T.R. attended monthly counseling due to his fear of respondent.

¶ 17        Respondent missed a scheduled September 2018 psychological evaluation. A second psychological evaluation began in December 2018, but the doctor could not complete the evaluation because respondent was combative and refused to sign the initial paperwork. Respondent was rated unsatisfactory for maintaining adequate contact with Cooper due to issues with his telephone and his refusal to provide her with important information.

¶ 18        According to Cooper, respondent failed to complete drug tests and admitted to using marijuana to self-medicate. Cooper informed respondent his continued marijuana use would not be considered if he provided a medical marijuana card, but respondent never sought to obtain a card. Cooper testified respondent usually communicated with her when he was with his substance-abuse counselor.

¶ 19                        3. *Amy Fellers*

¶ 20        Amy Fellers testified she took over as caseworker in January 2019. According to Fellers, respondent had not completed substance-abuse treatment, domestic-violence treatment, or anger management. Respondent failed to engage in individual therapy and to maintain contact. Fellers testified the only service respondent completed was parenting. Respondent also completed a psychological evaluation at a third appointment. The psychological evaluation

recommended additional services. Because respondent had only completed parenting classes, Fellers testified it was unreasonable to add additional services.

¶ 21                                    4. *Renee Poke*

¶ 22            Renee Poke, a rehabilitation drug and alcohol counselor at New Directions, testified respondent began counseling with her in April 2018. Respondent reported using marijuana to cope with the stress of day-to-day living. Following a completed psychological evaluation, respondent sought a medical marijuana card. Respondent told Poke he sought mental-health counseling through Crosspoint but he went on the wrong day and the counselor was unavailable.

¶ 23            When T.R. was removed, respondent lost his food stamps for approximately six months. Respondent lost his medical card because he failed to fill out and return a renewal form. Poke and respondent discussed his childhood in foster care, his mental-health issues, his living situation, and his lack of food.

¶ 24            Poke testified she received a copy of respondent's completed psychological evaluation. Poke agreed with most of the evaluation except for the conclusion that respondent was not interested in raising T.R. According to Poke, respondent had a bed ready for T.R. and was diligently attending counseling with her. Poke testified respondent denied causing T.R.'s injuries but admitted he did not seek proper medical care after T.R. fell.

¶ 25                                    5. *Kris Bell*

¶ 26            Kris Bell, an anger-management counselor at New Directions, testified that respondent began participating in services in January 2018. According to Bell, respondent made progress and her agency was willing to continue working with respondent. Bell acknowledged that addressing respondent's mental-health issues would be helpful to his anger-management

treatment. Bell testified the anger-management treatment was a 12-week course and respondent was "really extended" and had to "go back and repeat certain steps." When Bell first met respondent, he was aggressive but following treatment had "done a total 180."

¶ 27                                    6. *Preslee Evans*

¶ 28          Preslee Evans testified she was respondent's probation officer from November 2016 to November 2018. Respondent was compliant and maintained regular contact. According to Evans, respondent was forthcoming about his active drug use and completed an assessment through New Directions. Evans testified respondent owed fines and fees while she had his case, which was a common reason for someone to be unsuccessfully discharged from probation. Evans verified respondent's seasonal employment at Dollar Tree from 2017 to 2018. According to Evans, respondent's medical card and food stamps were affected by his seasonal employment and T.R.'s removal.

¶ 29                                    7. *Respondent*

¶ 30          Respondent testified he had trouble getting in touch with his caseworkers because they were often out of the office. According to respondent, the caseworkers were more likely to listen if he contacted them when he was with a counselor or his probation officer. Respondent felt he stayed in contact with his caseworkers, but they were not responsive to his calls.

¶ 31          By January 2018, respondent's medical card was cut off and was reinstated in November 2018. Respondent continued to attend treatment at New Directions and wanted T.R. to return home. Respondent left his job at Dollar Tree shortly after T.R.'s removal. Respondent applied for disability benefits, which required a psychological evaluation. An evaluation for a medical marijuana card reported respondent suffered from a severe chronic post-traumatic stress disorder. In May 2019, a doctor signed for respondent's medical marijuana card, and all

respondent had to do was pay the $102 fee. Respondent testified he entered foster care at the age of 7 and began smoking marijuana at the age of 12.

¶ 32                                 8. *Trial Court's Findings*

¶ 33        The trial court noted the case involved respondent's physical abuse of T.R. and the mental-health issues that led to the abuse. The court acknowledged respondent's participation in substance-abuse and anger-management treatment for approximately 18 months, but further noted those treatments were not designed to address the underlying issues. The court found Bell's testimony that respondent had made a 180-degree turnaround inconsistent with respondent's inability to get through initial paperwork with a psychologist after 11 months of anger-management treatment. Respondent had the responsibility to make efforts and progress in obtaining treatment for his mental-health issues. The court acknowledged respondent engaged in some services, but only those he was comfortable with, such as the New Directions counselors and his probation officer. The court found the State met its burden of proving respondent failed to (1) maintain a reasonable degree of concern or responsibility for T.R.'s welfare, (2) make reasonable efforts to correct the conditions that led to removal, and (3) make reasonable progress toward T.R.'s return.

¶ 34                          C. Best-Interest Proceedings

¶ 35        In July 2019, the trial court held a best-interest hearing.

¶ 36                                1. *Amy Fellers*

¶ 37        Fellers testified T.R. had been in a specialized foster placement since April 2018. Prior to that placement, T.R. was psychiatrically hospitalized at Pavilion Behavioral Health System. T.R. was entering the third grade and had an individualized education plan (IEP) in place. The IEP was for a traumatic brain injury and allowed T.R. to work with a special

education teacher with needed breaks to de-escalate if an issue arose. T.R. took Adderall for his attention deficit hyperactivity disorder (ADHD) and attended individual therapy twice per month.

¶ 38 According to Fellers, respondent had no visits with T.R. since she took over the case. Fellers contacted respondent monthly, but he usually did not return her calls. Respondent was still participating in services.

¶ 39 Fellers visited the foster placement three times a month and found T.R. safe, happy, and healthy in his placement. The foster placement appropriately provided for T.R.'s needs and ensured he attended all medical and therapy appointments. Fellers opined the foster placement was the best available option for T.R. and it was in his best interest to remain in his placement. The foster family signed a commitment to offer T.R. permanency through adoption.

¶ 40                                    2. *Respondent*

¶ 41 Respondent testified he was still participating in substance-abuse and anger-management treatment through New Directions. Respondent continued engaging in services to try to get T.R. home. Prior to T.R.'s removal, respondent provided for T.R. without help from family. Respondent testified he loved his son and wanted him to return to live with respondent.

¶ 42                                 3. *Trial Court's Findings*

¶ 43 The trial court considered the statutory factors in making its best-interest determination. The court found T.R.'s need for permanence to be of paramount importance. The court noted T.R. had been in his foster placement for 15 months and had ties to his community and peers through church and school. Respondent was no closer to having T.R. returned home than he had been at the start of the case, and T.R. felt a sense of safety and

attachment in his current placement. The court concluded it was in T.R.'s best interest to terminate respondent's parental rights.

¶ 44 This appeal followed.

¶ 45                                II. ANALYSIS

¶ 46 On appeal, respondent asserts the trial court's fitness and best-interest findings were against the manifest weight of the evidence. We turn first to the fitness finding.

¶ 47                              A. Fitness Finding

¶ 48 In a proceeding to terminate parental rights, the State has the burden of proving parental unfitness by clear and convincing evidence. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004). In making such a determination, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). Evidence of unfitness based on any ground enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) is enough to support a finding of unfitness, even where the evidence may not be sufficient to support another ground. *In re C.W.*, 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1113 (2002). A reviewing court will not overturn the trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Jordan V.*, 347 Ill. App. 3d at 1067. The trial court's decision is given great deference due to "its superior opportunity to observe the witnesses and evaluate their credibility." *Id.*

¶ 49 The trial court found respondent unfit on three different grounds: (1) respondent failed to maintain a reasonable degree of concern or responsibility as to T.R.'s welfare; (2) respondent failed to make reasonable efforts to correct the conditions that were the basis of removal within nine months of an adjudication of neglect, specifically May 13, 2018, to

- 10 -

February 13, 2019; and (3) respondent failed to make reasonable progress toward the return of T.R. within the same nine-month period. On appeal, respondent contends the trial court's finding of unfitness was against the manifest weight of the evidence. We may affirm on any basis in the record and we need not review all the grounds for a finding of unfitness if we uphold the trial court's findings as to one ground of unfitness. See *In re D.H.*, 323 Ill. App. 3d 1, 9, 751 N.E.2d 54, 61 (2001). As we find the trial court's finding as to reasonable progress dispositive, we begin there.

¶ 50        The trial court's finding that respondent failed to make reasonable progress toward the return of the minor within nine months after an adjudication of neglect, specifically May 13, 2018, to February 13, 2019, was not against the manifest weight of the evidence. Reasonable progress is measured by an objective standard that considers the progress made toward the goal of returning the child to the parent. *In re M.A.*, 325 Ill. App. 3d 387, 391, 757 N.E.2d 613, 617 (2001). Specifically, reasonable progress includes a parent's compliance with service plans and court directives in light of the condition that gave rise to the removal of the child. *In re C.N.*, 196 Ill. 2d 181, 216, 752 N.E.2d 1030, 1050 (2001).

¶ 51        In this case, T.R. came into DCFS care based on issues with physical abuse and respondent's mental-health issues. During the nine-month period at issue here, respondent failed to successfully complete services. Respondent failed to engage in individual therapy, which was a threshold requirement before he could engage in domestic violence services. Domestic violence was a primary issue in this case. Respondent also failed to maintain consistent contact with his caseworkers. Respondent further failed to successfully complete the anger-management treatment after 18 months. The testimony showed that, although his counselor asserted he made a 180-degree turnaround, he failed to complete the 12-week course in those 18 months.

Additionally, as the trial court noted, Bell's testimony about respondent's transformation was belied by the fact that respondent failed to complete the initial paperwork for a psychological evaluation after he became combative with the psychologist.

¶ 52    Respondent contends he failed to complete his services because his caseworkers failed to provide the services. He also argues he could not engage in counseling services because he had no medical card and could not otherwise afford the services. However, the testimony established that respondent failed to return renewal paperwork for the medical card and failed to engage in individual therapy once his medical card was reinstated. Moreover, Cooper testified counseling was available to respondent through Crosspoint without a medical card. Nonetheless, respondent failed to engage in those services. As the trial court noted, respondent did engage in some services, such as the anger-management and substance-abuse treatment. However, respondent only engaged in those services with which he was comfortable, and he avoided, sometimes combatively, engaging in the other recommended services. We further note that the services respondent failed to engage in were only the first step. Respondent failed to make sufficient progress to advance to services directly addressing the primary issues in this case.

¶ 53    Although respondent completed some services, he never progressed to a point where the caseworkers were close to returning the children. Given respondent's failure to engage in all the recommended services, we cannot say the trial court's determination respondent failed to make reasonable progress toward having T.R. returned to his care was against the manifest weight of the evidence.

¶ 54                      B. Best-Interest Finding

¶ 55    Once the trial court determines a parent to be unfit, the next stage is to determine whether it is in the best interest of the minor to terminate parental rights. *In re Jaron Z.*, 348 Ill.

- 12 -

App. 3d 239, 261, 810 N.E.2d 108, 126 (2004).  The State must prove by a preponderance of the evidence that termination is in the best interest of the minor.  *Id.*  The trial court's finding will not be overturned unless it is against the manifest weight of the evidence.  *Id.* at 261-62.

¶ 56        The focus of the best-interest hearing is to determine the best interest of the child, not the parent.  705 ILCS 405/1-3(4.05) (West 2018).  The trial court must consider the following factors, in the context of the child's age and developmental needs, in determining whether to terminate parental rights:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments ***[;]

* * *

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for

the child." *Id.*

¶ 57    The trial court, in considering the relevant best interest factors, concluded that the evidence showed T.R. felt a sense of safety and attachment in his foster placement. T.R. was doing well in his foster placement, as evidenced by his newly developed IEP and his ties to his community and peers through church and school. Moreover, the foster mother expressed willingness to provide permanency for T.R. through adoption. The evidence established T.R. was in a loving, stable home that provided for his needs and ensured he attended all medical and therapy appointments.

¶ 58    Conversely, respondent cannot provide stability and permanence for T.R. in the near future. Although the evidence showed respondent loved T.R. and wished for him to return home, he failed to show he could provide, in the near future, permanency for T.R. Respondent failed to make reasonable progress toward T.R.'s return in the time the case was pending. The trial court noted that respondent was no closer to T.R.'s return than he had been at the outset of the case. The court noted respondent had not successfully completed any services and continued to deny his involvement in T.R.'s injuries. The court determined T.R.'s need for permanence, stability, and security outweighed any harm from terminating respondent's parental rights. Accordingly, the court determined it was in T.R.'s best interest to terminate respondent's parental rights.

¶ 59    Given the extent to which T.R. was thriving in his foster placement and the possibility of permanence and stability in the near future through adoption, we conclude the trial court's finding it was in the child's best interest to terminate respondent's parental rights was not against the manifest weight of the evidence. Accordingly, we affirm the judgment of the court.

¶ 60                                    III. CONCLUSION

¶ 61            For the foregoing reasons, we affirm the trial court's judgment.

¶ 62            Affirmed.