NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 200149-U

NO. 4-20-0149

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 3, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.E., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
|     Petitioner-Appellee, | ) | No. 17JA48 |
|         v. | ) | |
| Araceli R., | ) | Honorable |
|     Respondent-Appellant). | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Knecht and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's fitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2    In March 2020, the trial court terminated the parental rights of respondent mother, Araceli R., as to her son, M.E. (born July 29, 2015). Respondent father is not a party to this appeal. On appeal, respondent argues the court's fitness and best-interest findings were against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 3    I. BACKGROUND

¶ 4    A. Initial Proceedings

¶ 5    In May 2017, the State filed a petition for adjudication of wardship, alleging M.E. was (1) abused where respondent created a substantial risk of physical injury to M.E., a one year old, due to him being present and unattended on May 22, 2017, when his one-month-old sister

was found unresponsive with blood coming from her mouth and pronounced dead at the hospital where she had a large amount of blood in her airway (705 ILCS 405/2-3(2)(ii) (West 2016)) and (2) neglected where M.E. was living in an environment injurious to his welfare in the care of respondent, who claimed to have been asleep, knowing that the minors were unattended for at least two and a half hours prior to M.E.'s sister being discovered unresponsive, and due to respondent's unresolved issues of domestic violence (705 ILCS 405/2-3(1)(b) (West 2016)). At a shelter care hearing, respondent stipulated to probable cause and immediate and urgent necessity, and the trial court granted the Department of Children and Family Services (DCFS) temporary custody of M.E.

¶ 6 In July 2017, the State filed a first supplemental petition for adjudication of wardship alleging, in relevant part, that M.E. was neglected where he was living in an environment injurious to his welfare in the care of respondent due to her unresolved issues of alcohol and/or substance abuse (705 ILCS 405/2-3(1)(b) (West 2016)). At an August 2017 adjudicatory hearing, respondent stipulated to the allegation of neglect that alleged M.E.'s environment was injurious to his welfare due to her alcohol and/or substance abuse. The trial court found there existed a factual basis for respondent's admission, evidenced by her positive drug screen at the May 24, 2017, shelter care hearing, and held M.E. to be neglected by a preponderance of the evidence. In an August 2017 dispositional order, the trial court (1) found respondent unfit, (2) made M.E. a ward of the court, and (3) granted DCFS guardianship and custody.

¶ 7 B. Termination Proceedings

¶ 8 In August 2019, the State filed a petition to terminate respondent's parental rights. The State alleged respondent failed to (1) make reasonable efforts to correct the conditions that

were the basis of the removal of M.E. from respondent within nine months after an adjudication of neglect, specifically November 13, 2018, to August 13, 2019 (750 ILCS 50/1(D)(m)(i) (West 2016)) and (2) make reasonable progress toward the return of M.E. within nine months after an adjudication of neglect, specifically November 13, 2018, to August 13, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2016)).

¶ 9                                    1. *Fitness Hearing*

¶ 10        In February and March 2020, the trial court conducted a bifurcated hearing on the petition for termination of parental rights, first considering respondent's fitness. The parties presented the following relevant testimony.

¶ 11                                    a. Respondent

¶ 12        Respondent testified that M.E. had been in foster care since May 24, 2017, and that it was his second time in foster care, the first time being in 2015 when he was one month old. Respondent also testified that she was convicted of obstruction of justice in McLean County case No. 17-CF-742, for lying to police about what happened to her one-month-old daughter on the day that she died. Respondent was sentenced to 180 days in the McLean county jail and served her sentence from February 15, 2018, to May 12, 2018.

¶ 13        Respondent testified that she ended her relationship with M.E.'s father in July 2017 and she discontinued living with him in October 2017. Respondent testified she began a relationship with Brandon Finley in December 2018, when he was released from jail for aggravated driving under the influence (DUI). However, respondent testified she engaged in regular and frequent visits with Finley prior to November 2018. Respondent testified she met Finley in December 2017 and that he was convicted of aggravated DUI in March 2018, while she was still in custody.

¶ 14        Respondent testified that in November 2018, she lied to the trial court about her relationship with Finley. Respondent told the court she was not in a romantic relationship with Finley. After lying to the court, respondent immediately called Finley and discussed with him that she was frustrated that the court was telling her who she could be in a relationship with. Respondent testified that Finley moved in with her in December 2018, and that they planned to get pregnant together. Respondent testified that from November 2018 to April 2019, she lied about being in a relationship with Finley. In April 2019, respondent informed a caseworker that she was pregnant with Finley's child.

¶ 15        At an April 2019 permanency review hearing, the trial court told respondent she needed to choose between Finley or M.E. Following the hearing, respondent asked her caseworker, Amber Elliot, whether Finley could attend a parent-child visit between M.E. and her. Respondent testified that in May 2019, she kicked Finley out of her apartment. However, respondent continued to have cellular phone contact with Finley until September 2019. When asked whether it was in M.E.'s best interest for respondent to be in a relationship with Finley, while knowing he had had issues with substance abuse, respondent admitted that she was not really thinking about M.E.'s best interest at that time.

¶ 16                                b. Amber Elliot

¶ 17        Amber Elliot, a case worker at the Center for Youth and Family Solutions (CYFS), testified she served as the caseworker on respondent's case starting in May 2017. Elliot testified she met respondent for the first time at the shelter care hearing and on the following day, she discussed her role as the caseworker with respondent. Elliot testified that in 2017, she did not believe that respondent fully understood why M.E. came into care.

¶ 18 Elliot testified that respondent completed an integrated assessment in 2017. Elliot testified she created a service plan for respondent in June 2017 and that she added additional services to respondent's service plan based on the recommendations within respondent's integrated assessment. Respondent's initial service plan required a visitation goal, a substance abuse goal, a domestic violence goal, a cooperation goal, and an individual counseling goal. After the integrated assessment, Elliot added a psychological evaluation, a parenting goal, and a goal to resolve respondent's legal issues.

¶ 19 Elliot testified respondent completed a substance abuse class and submitted to regular drug screens which were negative. Respondent completed domestic violence classes in February 2018. Respondent completed a psychological evaluation in November 2017. Respondent regularly attended individual counseling with Kimberly Klepec. Respondent resolved her criminal case by serving her sentence. Respondent had been consistent in her visitation where she attended all visits with M.E. and was appropriate with M.E. during visitation. Respondent also completed parenting classes.

¶ 20 Elliot testified she learned respondent was in a relationship with Finley in November 2018. Prior to then, respondent informed Elliot she and Finley were not in a relationship. Elliot testified that respondent's May 2019 permanency goal to return M.E. home was rated unsatisfactory because between November 2018 and May 2019, respondent "had been dishonest continuously about her relationship with Mr. Finley."

¶ 21 Elliot testified that in late March 2019, she learned from an agency support worker that respondent might be pregnant. Elliot testified she asked respondent on April 2, 2019, if she was pregnant and respondent "indicated that she was pregnant and it was [Finley's] baby, but they were not in a relationship." Elliot testified that between November 2018 and

April 2019, she fully believed that respondent was in a relationship with Finley—although respondent continued to deny the relationship—due to several observations including jail visits and transcripts of telephone calls between respondent and Finley.

¶ 22    Elliot testified she was not sure if respondent understood what the trial court meant when it instructed respondent to make a choice between M.E. or Finley because following the court's instruction, respondent requested that Finley be allowed to attend parent-child visits with her and M.E. Elliot testified that by May 2019, "the truthfulness [by respondent] up to that point had been little to none. And so there was some—somewhat of an expectation that whatever I was told probably wasn't 100 percent honest in the first place." While Elliot testified that respondent completed most of the components of her service plan, there were still issues with returning M.E. to her care due to concerns with safety, respondent's cooperation, and with respondent's judgment. Elliot testified her "concern is that [respondent] put her own needs above what would have been the safety needs for her child."

¶ 23    Elliot testified that during the relevant nine-month period, she believed respondent displayed poor judgment and was not looking out for M.E.'s best interests. Elliot stated that respondent's "services were completed, but the progress just wasn't there. The services were done, but the changes in her behavior were not."

¶ 24                              c. Kimberly Klepec

¶ 25    Kimberly Klepec, a licensed clinical social worker, testified she began seeing respondent in August 2018 as part of her volunteer services with Integrity Counseling. Klepec testified that she worked with respondent on cognitive behavior therapy, processing through her grief following the death of her daughter, and processing through her childhood trauma. Klepec

testified she conducted 33 sessions with respondent between August 2018 and May 2019. On average, Klepec saw respondent at least once a month, usually three or four times a month.

¶ 26         Klepec testified that in October 2018, respondent told her about Finley and, based on their conversation, Klepec understood Finley to be "a male that [respondent] was interested in romantically, and he was in jail." Klepec testified that she advised respondent not to continue a relationship with Finley because of her case with DCFS. Subsequently, Klepec spoke with Elliot about her concerns that respondent would become pregnant before working through her grief.

¶ 27         Klepec testified that in November 2018, she noted that respondent did not understand the problem with seeing Finley and having a relationship with him. Klepec testified that in April 2019, when she suggested that respondent be successfully discharged from counseling, she was not aware that Finley was living with respondent. In early April 2019, respondent told Klepec that she was eight weeks pregnant with Finley's child. Klepec testified that by June 2019, she "definitely knew that [Finley] had moved in with [respondent] for a period of time." Klepec acknowledged that some of the information in her reports was not accurate based on the information that was omitted by respondent. Klepec testified that she believed if respondent "had been more honest with me, we could have worked more specifically on [respondent's progress] goals."

¶ 28                         d. Trial Court's Findings

¶ 29         After hearing the evidence, the trial court in March 2020 found, by clear and convincing evidence, respondent unfit on both grounds. Specifically, the court stated,

"So when we look at the two grounds, that being

reasonable efforts, we all know that that's subjective, subjective

standard of review. We're looking to see if we have made

- 7 -

reasonable efforts to correct the conditions there [*sic*] were the basis for the removal of the child from Mom's care. So while it's the death of a child that led to [M.E.]'s removal, we look at the issues that need to be addressed, set forth in the dispositional order. Court believes that we were not making reasonable efforts to correct the conditions in the nine-month period that was set forth in the petition to terminate parental rights. We weren't providing a home free of substance issues. We weren't providing a home that was free of, quite frankly, problematic individuals, individuals who would not be appropriate for [M.E.] to be around. And I think that's born out clearly in the evidence.

So Court believes that paragraph 8A has been proven by clear and convincing evidence. When we talk about reasonable progress towards the return home, it's an objective standard. Again, can the trial court objectively conclude that the parent's progress is sufficiently demonstrable, and is of such quality that the child can be returned to the parent within the near future? While we may have been at that point, prior to the nine-month time period based upon [respondent's] progress on her service plan, failure to disclose information, minimize the relationship, keep things hidden, remain in that relationship for a lengthy period of time without letting parties know the extent of the relationship, is problematic. Her choices to be involved with Mr. Finley, bring

- 8 -

Mr. Finley's problems into this case, Court's of the opinion that because of that, we couldn't return [M.E.] home at that nine-month period. We were not at a point where return could occur in the near future because of this long-standing problem in this relationship with Mr. Finley and Mr. Finley's problems.

So Court believes that paragraph 8B has been established by clear and convincing evidence, as well. [Respondent] failed to make reasonable progress towards the return home. Court is going to find [respondent] unfit."

¶ 30                                    2. *Best-Interest Hearing*

¶ 31        In March 2020, immediately following its fitness ruling, the trial court held a separate best-interest hearing. The parties presented the following relevant testimony.

¶ 32                                    a. Kirstin Johnson

¶ 33        Kirstin Johnson testified that M.E. came into her care on May 23, 2017. Johnson testified she worked at Illinois State University as a graduate assistant in the psychology department and was also working on her doctoral degree in school psychology. Johnson testified that she had a long-term girlfriend but that they did not reside together.

¶ 34        Johnson testified that M.E. has his own room in her apartment and that he has integrated into her extended family better than she could have imaged. Johnson also testified that M.E. is full of energy, kind-hearted, loving, and very bright. M.E. attends school and day care, and he has friends at both. Johnson testified that M.E. would have intense behavioral outbursts following visits with respondent but those outbursts had improved. Johnson testified that M.E. rarely talked about respondent.

¶ 35        Johnson testified that she was aware M.E. is half black and half Hispanic.  They

talk about his ethnicity and have checked books out at the library about families of different

colors.  Johnson testified that her training in her career path will also allow her to help M.E.

explore his ethnicity and identity.

¶ 36        Johnson testified she thought it would be in M.E.'s best interest to terminate

respondent's parental rights.  Specifically, Johnson stated, "My opinion is that [M.E.] has been in

a stable home for just shy of three years.  He has created a life that he's now aware of, and I do

think that it would be in his best interest to maintain that."  Johnson testified she loves M.E. and

that they have a strong bond.  Johnson maintained that she would be willing to do what was

determined to be in M.E.'s best interest, such as maintaining communication with his biological

mother and siblings, even if she were to adopt M.E.

¶ 37                            b. Trial Court's Findings

¶ 38        After reviewing the best-interest reports from CYFS and court-appointed special

advocates and hearing the evidence and recommendations from counsel, the trial court found it

was in M.E.'s best interest to terminate respondent's parental rights.  The court considered the

relevant best-interest factors in reaching its decision.

¶ 39        This appeal followed.

¶ 40                            II. ANALYSIS

¶ 41        On appeal, respondent argues the trial court erred in finding respondent to be an

unfit parent and terminating her parental rights.  We address these arguments in turn.

¶ 42                            A. Fitness Finding

¶ 43        In a proceeding to terminate parental rights, the State has the burden of proving

parental unfitness by clear and convincing evidence.  *In re Jordan V.*, 347 Ill. App. 3d 1057,

1067, 808 N.E.2d 596, 604 (2004).  In making a determination, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)).  Evidence of unfitness based on any ground enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) is enough to support a finding of unfitness.  *In re C.W.*, 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1113 (2002).  A reviewing court will not overturn the trial court's finding of unfitness unless it is against the manifest weight of the evidence.  *Jordan V.*, 347 Ill. App. 3d at 1067.  The trial court's decision is given great deference due to "its superior opportunity to observe the witnesses and evaluate their credibility."  *Id.*

¶ 44            The court found respondent unfit where respondent failed to (1) make reasonable efforts to correct the conditions that were the basis of the removal of M.E. from respondent within nine months after an adjudication of neglect, specifically November 13, 2018, to August 13, 2019 (750 ILCS 50/1(D)(m)(i) (West 2016)) and (2) make reasonable progress toward the return of M.E. within nine months after an adjudication of neglect, specifically November 13, 2018, to August 13, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2016)).

¶ 45            The trial court's finding that respondent failed to make reasonable progress toward the return of M.E. within nine months following the adjudication of neglect was not against the manifest weight of the evidence.  Reasonable progress is measured by an objective standard that considers the progress made toward the goal of returning the child to the parent.  *In re M.A.*, 325 Ill. App. 3d 387, 391, 757 N.E.2d 613, 617 (2001).  A parent has made reasonable progress when "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the

- 11 -

near future, will be able to order the child returned to parental custody." (Emphasis and internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227.

¶ 46 Respondent argues that her integrated assessment was not considered or followed when Elliot created her service plan and therefore her constitutional right—under the fourteenth amendment—in the care, custody, and management of her child was violated by the agency's failure to implement their procedure. The State disagrees and argues adequate services were provided to respondent through her service plan and additional services were added based on her integrated assessment. We agree with the State.

¶ 47 At respondent's fitness hearing, Elliot testified she created a service plan for respondent in June 2017 and that she added additional services to respondent's service plan based on the recommendations within respondent's integrated assessment. Specifically, Elliot testified that "based on the integrated assessment, I did what I call like a subsequent initial where services were added based on the integrated assessment." Respondent's initial service plan required a visitation goal, a substance abuse goal, a domestic violence goal, a cooperation goal, and an individual counseling goal. After the integrated assessment, Elliot added a psychological evaluation, a parenting goal, and a goal to resolve her legal issues.

¶ 48 Elliot testified that respondent completed a substance abuse class and submitted to regular drug screens which were negative. Respondent completed a psychological evaluation in November 2017, a domestic violence class in February 2018, and parenting classes. Respondent regularly attended individual counseling with Klepec. Klepec testified that she conducted 33 sessions with respondent between August 2018 and May 2019. On average, Klepec saw respondent at least once a month, usually three or four times a month. Respondent also consistently engaged in visitation with M.E. and showed appropriate behavior during visits.

¶ 49 Respondent concedes that the issue of whether she made reasonable progress toward the return of M.E. between November 13, 2018, and August 13, 2019, was a "tougher issue for her to address" because she engaged in a new relationship and was not forthcoming about it to her caseworker. Respondent testified at her fitness hearing that from November 2018 to April 2019, she lied to the trial court and her caseworker about being in a relationship with Finley. By April 2019, respondent was pregnant with Finley's child. At an April 2019 permanency review hearing, the court told respondent she needed to choose between Finley or M.E. Following the hearing, respondent asked Elliot whether Finley could attend a parent-child visit with her and M.E.

¶ 50 At respondent's fitness hearing, Elliot testified that by May 2019, "the truthfulness [by respondent] up to that point had been little to none. And so there was some— somewhat of an expectation that whatever I was told probably wasn't 100 percent honest in the first place." While Elliot testified that respondent completed most of the components of her service plan, there were still issues with returning M.E. to her care due to concerns with safety, respondent's cooperation, and with respondent's judgment. Elliot testified that during the relevant nine-month period, she believed respondent displayed poor judgment and was not looking out for M.E.'s best interests. Elliot stated that respondent's "services were completed, but the progress just wasn't there. The services were done, but the changes in her behavior were not."

¶ 51 The trial court found that during the relevant nine-month period respondent's actions were problematic. The court found that respondent failed to make reasonable progress to have M.E. returned to her care where she failed to disclose information, minimized her

- 13 -

relationship with Finley, kept things hidden, and remained in the relationship for a lengthy period of time without letting parties know the extent of the relationship.

¶ 52    Absent in the record is any indication that the trial court, in the near future, would have been able to return M.E. to respondent. Given respondent's failure to inform the court of her relationship with Finley and her decision to instead lie about her relationship from November 2018 to April 2019, we cannot say the court's determination that respondent failed to make reasonable progress toward having M.E. returned to her care within nine months following the adjudication of neglect was against the manifest weight of the evidence. Because we have upheld the court's finding as to one ground of unfitness, we need not review the other ground. See *In re D.H.*, 323 Ill. App. 3d 1, 9, 751 N.E.2d 54, 61 (2001).

¶ 53                    B. Best-Interest Finding

¶ 54    Once the trial court determines a parent to be unfit, the next stage is to determine whether it is in the best interest of the minor to terminate parental rights. *In re Jaron Z.*, 348 Ill. App. 3d 239, 261, 810 N.E.2d 108, 126 (2004). The State must prove by a preponderance of the evidence that termination is in the best interest of the minor. *Id.* The trial court's finding will not be overturned unless it is against the manifest weight of the evidence. *Id.* at 261-62.

¶ 55    In making a best-interest determination, the trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2016)), including the child's physical safety and welfare, including food and health; need for permanence, stability and continuality; sense of attachment, love security, and familiarity; community ties; and the uniqueness of every child. 705 ILCS 405/1-3(4.05) (West 2016).

¶ 56      Respondent argues the trial court erred when it found that it was in M.E.'s best interest to terminate her parental rights because she completed her service plan, showed love and affection to M.E. every time she saw him, and she never missed visits with M.E.

¶ 57      Here, the trial court analyzed the best-interest factors based on the record, the best-interest reports, and the testimony presented at the best-interest hearing. At the best-interest hearing, Johnson expressed an interest in adopting M.E., who resided with her just shy of three years. She informed the court that M.E. had his own room in her apartment and that he had integrated into her extended family better than she could have imaged. M.E. attended day care and school and had friends at both. M.E. was happy in his foster placement, was bonded to his foster mother, and rarely talked about respondent.

¶ 58      The trial court found that M.E. was attached to Johnson and that over the last three years Johnson helped M.E. develop and identify who he is. The court stated,

> "I think [M.E.] obviously identifies who his mother is, [respondent]. But when you spend a significant period of time in foster care, away from a parent, we tend to attach to those individuals who are caring for us. As I said, 65 percent of this young man's life has been spent outside of [respondent's] care just in this case alone."

The court found Johnson could provide M.E. permanency, and it stated, "I think that that factor favors termination."

¶ 59      The evidence shows the trial court analyzed all the relevant best-interest factors. We find the court's termination of respondent's parental rights was not against the manifest weight of the evidence. Accordingly, we affirm the court's judgment.

¶ 60                                    III. CONCLUSION

¶ 61            For the reasons stated, we affirm the trial court's judgment.

¶ 62            Affirmed.