NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210649-U

NOS. 4-21-0649, 4-21-0650 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 4, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.R., a Minor | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 19JA4 |
| v.     (No. 4-21-0649) | ) | |
| Jerrica R., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* H.R., a Minor | ) | No. 19JA5 |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.     (No. 4-21-0650) | ) | Honorable |
| Jerrica R., | ) | John C. Wooleyhan, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, concluding the trial court's fitness finding was not
against the manifest weight of the evidence.

¶ 2         On October 29, 2021, the trial court terminated the parental rights of respondent,

Jerrica R., as to her children, M.R. (born March 23, 2016) and H.R. (born June 5, 2018).

Respondent father, Kevin R., is not a party to this appeal.  On appeal, respondent argues the trial

court's fitness finding was against the manifest weight of the evidence.  For the following

reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                               A.  Initial Proceedings

¶ 5            On January 9, 2019, the State filed a petition for adjudication of wardship, alleging M.R. and H.R. were neglected in that their environment was injurious to their welfare. The petition provided that on November 28, 2017, respondent was indicated for environmental neglect and an intact case was opened.  Then, on June 5, 2018, respondent was indicated for substantial risk of harm after H.R.'s meconium tested positive for "Amphetamines/Methamphetamine."  On January 3, 2019, respondent was arrested for possession of methamphetamine.  On January 7, 2019, the Department of Children and Family Services (DCFS) took protective custody of M.R. and H.R. On that same day, respondent admitted to Child Protection Investigator Michael Hugenberg that she had used methamphetamine two times per week for the last three months.  Subsequently, the trial court placed M.R. and H.R. in shelter care and granted DCFS temporary custody and guardianship of M.R. and H.R.

¶ 6            On July 9, 2019, the trial court entered an adjudicatory order finding M.R. and H.R. neglected after respondent stipulated to the allegations in the petition for adjudication of wardship.  In a September 10, 2019, dispositional order, the trial court (1) found respondent unfit, (2) made M.R. and H.R. wards of the court, and (3) granted DCFS guardianship and custody.

¶ 7                               B.  Termination Proceedings

¶ 8            On June 23, 2021, the State filed a motion seeking to terminate respondent's parental rights.  The State alleged respondent failed to (1) make reasonable efforts to correct the conditions that were the basis of removal (750 ILCS 50/1(D)(m)(i) (West 2020)) and (2) make

- 2 -

reasonable progress toward the return of M.R. and H.R. within nine months after an adjudication of neglect, specifically July 10, 2019, to April 9, 2020, and April 10, 2020, to January 8, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 9                                    1. *Fitness Hearing*

¶ 10          On October 29, 2021, the trial court conducted a bifurcated hearing on the motion for termination of parental rights, first considering respondent's fitness. The court heard the following testimony.

¶ 11                                    a. Toni McCulloch

¶ 12          Toni McCulloch, a licensing representative at Lutheran Child and Family Services (LCFS), testified she served as the child welfare specialist on respondent's case from November 2019 until June 2020. McCulloch testified that when she took over the case, there was already a service plan in place. McCulloch acknowledged respondent's and respondent father's substance abuse, mental health issues, and environmental neglect in the form of an unsanitary living environment brought the minors into care.

¶ 13          McCulloch created a service plan for respondent dated January 9, 2020. McCulloch testified respondent's service plan indicated "She needed to maintain a home, a safe environment for the children. She needed to cooperate with mental health counseling, substance abuse counseling, substance abuse treatment, drug testing positive—not positive, sorry, negative drug tests, staying clean. I would have to look. I think that's the majority of them." McCulloch also testified respondent needed to complete a parenting class and "then show that she was able to use the skills from the parenting class appropriately with the children during visits." McCulloch provided respondent "did not pass the parenting class. She missed the very last class because she was incarcerated."

¶ 14    McCulloch testified respondent participated in supervised visits with the children twice a week.  McCulloch described being present for a few of the visits where she observed respondent interact with M.R. and H.R.  McCulloch stated that when she observed respondent, "[respondent] didn't communicate very well with [M.R.]  At times she would—she wouldn't really interact much with [H.R.] at all.  She did show some signs of erratic behavior a couple of times where we suspected that she was under the influence."  McCulloch noted that M.R. was autistic, nonverbal, and used sign language.  McCulloch testified respondent never learned sign language to communicate with M.R.

¶ 15    McCulloch testified that in November 2019, she went to respondent's house to observe the living conditions and found the house "was very cluttered."  McCulloch observed old food on the kitchen counters and the bathroom had a bad odor.  McCulloch also noted there "were two or three dogs in the home."  McCulloch testified that from January 2020 until June 2020, she was unable to observe the interior of the home because respondent and respondent father failed to answer the door.  McCulloch also testified that around that time, respondent father started having mental health issues causing authorities to recommend that he leave the home in order to keep the children and respondent safe.  McCulloch stated she was never able to verify if respondent father actually moved out of the home.

¶ 16    As to respondent's mental health, McCulloch testified she spoke with respondent's therapist and the therapist expressed that respondent "was making contact and she was attempting to make progress."  As to substance abuse treatment, McCulloch testified respondent attended counseling but did not consistently cooperate with drug testing.  Specifically, McCulloch testified that on her second visit to respondent's home she tested both respondent and respondent father and they both tested positive for methamphetamines and

amphetamines. McCulloch stated respondent drug tested before visitations with the children and "[m]ost of them were consistently negative." However, McCulloch testified, "We had reasons to believe that [respondent] was taking something before the visits to be able to pass—to get a false negative." McCulloch stated that at no time did she ever consider unsupervised visitation for respondent. McCulloch also provided that in January 2020 she mainly communicated with respondent at visits or occasionally by phone.

¶ 17    In the January 9, 2020, service plan, McCulloch rated respondent unsatisfactory in attending and participating in parenting classes on a consistent basis because she missed the last parenting class. McCulloch rated respondent unsatisfactory in obtaining and utilizing appropriate parenting skills. Specifically, McCulloch stated respondent "sometimes shows her positive parenting skills during visits but is not consistent, mostly because at times she appears to be under the influence." McCulloch rated respondent unsatisfactory as to substance use and abuse treatment. McCulloch stated respondent "has not successfully completed but is attending outpatient services. [Respondent] has been consistent with attending services for the last couple months. However, there is concern she is not being truthful about her use." Further, McCulloch noted the possibility respondent was drinking something to be able to test negative. McCulloch rated respondent's remaining tasks as satisfactory. McCulloch testified the July 6, 2020, service plan was created after she stopped working on the case.

¶ 18                              b. Angie Danzeisen

¶ 19    Angie Danzeisen, a DCFS child welfare specialist, testified she previously served as a LCFS supervisor and caseworker on respondent's case beginning September 21, 2020, until August 20, 2021. Specifically, Danzeisen served as a supervisor over caseworker Patricia Salzman from September 21, 2020, until November 24, 2020. After Salzman left her position,

Danzeisen served as the caseworker from November 2020 until January 2021. Danzeisen testified that when she started on the case, a service plan for respondent, created by Salzman, already existed. Danzeisen rated the service plan created by Salzman.

¶ 20        Danzeisen also testified that at the beginning of her tenure on respondent's case, she was unable to reach respondent other than one time in court on December 1, 2020. Further, Danzeisen stated, "Prior to November [2020], the previous worker also reported that [respondent] was not returning any of her phone calls or text messages." Danzeisen created a new service plan for respondent dated January 25, 2021. The majority of Danzeisen's testimony discussed the services and goals under the January 25, 2021, service plan, which fell outside the nine-month periods identified as at issue by the State.

¶ 21                              c. Shelly Huseman

¶ 22        Shelly Huseman, director of LCFS, testified she approved respondent's July 6, 2020, service plan created by Salzman and respondent's January 25, 2021, service plan created by Danzeisen. Huseman provided she was familiar with respondent's case only from a director standpoint. Huseman testified she only approved respondent's service plans where the caseworker created and rated the plans. Huseman testified she believed Salzman created and rated the July 6, 2020, service plan with the help of Shawn Smith, who had been in training at that time.

¶ 23        The July 6, 2020, service plan stated,

              "[Respondent] has been highly cooperative with all of her
              service providers. On 9-23-20, a [Child and Family Team
              Meeting] was held with all of [respondent's] service providers. It
              was reported by all involved that she is making outstanding

progress and it is felt that she should be able to reunite with the children. The only concern was that she has maintained a relationship with [respondent father], who has not been compliant with services. She stated that she has had him move out and did not know that maintaining contact threatened her parenting ability. She agreed at that time to end her relationship for her children and not resume unless [respondent father] made significant changes in his life and mental health that would allow him to safely interact with the children."

The caseworker rated respondent unsatisfactory in successfully completing an approved parenting class. The caseworker rated respondent's remaining tasks as satisfactory.

¶ 24                                    d. Trial Court's Findings

¶ 25            Following the testimony, the trial court admitted into evidence respondent's three service plans, dated January 9, 2020, July 6, 2020, and January 25, 2021. The court also took judicial notice of respondent's pending criminal cases for possession of methamphetamine and retail theft. Respondent's cases were set for resentencing on November 19, 2021.

¶ 26            After hearing the evidence and arguments by the parties, the trial court found the State proved respondent unfit by clear and convincing evidence. Specifically, the court stated,

"The evidence has shown that during these nine-month time periods, for a total period of 18 months, the mother was engaged in some services, did make some progress at various times toward resolving the issues which brought the cases into court in the first

place, but it never rose to the level of substantial progress as required by the statute.

The evidence was that she was in some services, attending services, but throughout that time, even though she was attending and participating in services, during both of these nine-month time periods that she was continuing to test positive for controlled substances at drug screens which were requested of her. That was one of the issues that brought the cases into court in the first place, and there has been no evidence to show that during these 18 months that the mother was able to make any progress or resolve that issue.

Also, the evidence has shown that the visits that the mother had during these 18 months were always supervised by the agency. They were never able to move to unsupervised visits, never able to provide for any extended visits with the mother, and there was never any recommendation made by anyone that the custody of the minors be returned to the mother.

The evidence has been that because of those situations we're actually no closer now after 18 months to returning the minors to the mother than we were at the beginning of the cases."

¶ 27                        2. *Best-Interest Hearing*

¶ 28        Immediately following the fitness hearing, the trial court held a best-interest hearing. The State presented evidence through Casey Gooding, a LCFS child welfare specialist,

who testified to the current living arrangements of the minors. After considering the State's evidence and arguments by the parties, the court found it was in M.R.'s and H.R.'s best interests to terminate respondent's parental rights.

¶ 29 This appeal followed. We docketed respondent's appeal in regard to M.R. as No. 4-21-0649 and respondent's appeal in regard to H.R. as No. 4-21-0650. We have consolidated respondent's cases for review.

¶ 30 II. ANALYSIS

¶ 31 On appeal, respondent argues the trial court erred in finding her unfit. We disagree and affirm.

¶ 32 We note respondent in her brief provides a citation to the statutory best-interest factors under section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2020)). However, given respondent makes no argument as to the trial court's best-interest finding, we limit our review to the finding of unfitness.

¶ 33 A. Standard of Review

¶ 34 The involuntary termination of parental rights involves a two-step process. 705 ILCS 405/2-29(2) (West 2020). First, the State must prove by clear and convincing evidence the parent is "unfit" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the trial court makes a finding of unfitness, the State must then prove by a preponderance of the evidence it is in the child's best interest to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004).

¶ 35 Only one ground for a finding of unfitness is necessary if it is supported by clear and convincing evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005).

We will not disturb a trial court's fitness finding unless it is against the manifest weight of the evidence. *Id.* at 354. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly apparent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123, 141 (2006).

¶ 36                                    B. Fitness Finding

¶ 37          The trial court found respondent unfit where respondent failed to (1) make reasonable efforts to correct the conditions that were the basis of removal (750 ILCS 50/1(D)(m)(i) (West 2020)) and (2) make reasonable progress toward the return of M.R. and H.R. within nine months after an adjudication of neglect, specifically July 10, 2019, to April 9, 2020, and April 10, 2020, to January 8, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 38          The court's finding that respondent failed to make reasonable progress toward the return of M.R. and H.R. within either of the two nine-month periods following the adjudication of neglect was not against the manifest weight of the evidence. Reasonable progress is measured by an objective standard that considers the progress made toward the goal of returning the child to the parent. *In re M.A.*, 325 Ill. App. 3d 387, 391, 757 N.E.2d 613, 617 (2001). A parent has made reasonable progress when "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the near future, will be able to order the child returned to parental custody." (Emphasis and internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227.

¶ 39          Respondent argues the trial court's fitness finding that she failed to make reasonable progress toward the return of M.R. and H.R. during any of the relevant nine-month periods is against the manifest weight of the evidence because the court erred when it placed significance on that fact that respondent "continue[d] to test positive for controlled substances at

drug screens which were requested of her." Respondent argues two witnesses testified about her continued drug use which was directly contradicted by the service plans. Specifically, respondent asserts that while she had positive drug screens in 2019, the service plans do not reference any positive test since that time. Further, respondent claims the service plans "praise" her for consistently testing clean and the service plans note she never missed any visitation with the children.

¶ 40 Here, the trial court explicitly stated it considered both the service plans and the testimony of the witnesses in reaching its fitness decision. Further, the court stated it "has been able to observe all the witnesses who testified here today to determine the weight and credibility to be assigned to each of them." The trial court's decision is given great deference due to "its superior opportunity to observe the witnesses and evaluate their credibility." *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004).

¶ 41 During the relevant nine-month periods (July 10, 2019, to April 9, 2020, and April 10, 2020, to January 8, 2021), respondent's service plans called for (1) cooperation and participation with her LCFS caseworker, (2) parenting class, (3) substance abuse treatment, (4) mental health treatment, (5) maintaining stable housing, and (6) visitation with the children. The evidence established respondent never completed parenting class where she missed the last parenting class because she was incarcerated. While respondent consistently attended weekly supervised visits with M.R. and H.R., McCulloch testified respondent did not communicate well with M.R. during visits and showed signs of erratic behavior at a couple of visits where respondent was suspected of being under the influence. McCulloch provided that respondent failed to consistently utilize proper parenting skills during visits. McCulloch never considered unsupervised visitation for respondent.

¶ 42    The evidence further established respondent regularly attended mental health counseling and substance abuse counseling. However, the record shows respondent was not consistently cooperative with drug testing. McCulloch testified that while most of respondent's pre-visitation drug tests were negative, "We had reason to believe that [respondent] was taking something before the visits to be able to pass—to get a false negative."

¶ 43    Respondent also failed to maintain (1) consistent contact with her caseworkers and (2) stable housing. Danzeisen testified that, while she saw respondent at visits with the children, she was never able to make any outside contact with respondent except for at a court appearance in December 2020. Danzeisen also provided that the caseworker before her reported respondent failed to maintain contact with her as well. McCulloch testified she visited respondent's residence early in the case. McCulloch rated respondent's housing task as satisfactory where the residence was clean, other than issues with clutter. However, from January 2020 to June 2020, McCulloch was unable to observe the inside of the residence because respondent and respondent father failed to answer the door. McCulloch also testified that around that time respondent father started having mental health issues causing authorities to recommend that he leave the home. McCulloch stated she was never able to verify he actually moved out of the home.

¶ 44    Absent in the record is any indication that the court, in the near future, would have been able to return M.R. and H.R. to respondent. While respondent participated and engaged in services, the record shows respondent (1) never moved past supervised visitation, (2) failed to consistently maintain contact with her LCFS caseworkers, (3) failed to maintain stable housing away from respondent father, and (4) failed to remain drug free. Given respondent's failure to complete all required services, we cannot say the trial court's

determination respondent failed to make reasonable progress toward having M.R. and H.R. returned to her care within any relevant nine-month period following the adjudication of neglect was against the manifest weight of the evidence. Because we have upheld the trial court's findings as to one ground of unfitness, we need not review the other ground. See *In re D.H.*, 323 Ill. App. 3d 1, 9, 751 N.E.2d 54, 61 (2001).

¶ 45                                                III. CONCLUSION

¶ 46            For the foregoing reasons, we affirm the trial court's judgment.

¶ 47            Affirmed.