NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210707-U

NOS. 4-21-0707, 4-21-0708 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 2, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.L. and R.L., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Menard County |
| Petitioner-Appellee, | ) | Nos. 17JA3 |
| v. | ) | 20JA1 |
| Nicole L., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Ramon Manuel Escapa, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed, concluding the trial court's order terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 2   Respondent, Nicole L., filed an appeal from the trial court's combined order terminating her parental rights to her minor children, M.L. (born September 4, 2017) and R.L. (born January 25, 2020). Each minor was the subject of a separate trial court case. Respondent appealed in each case, raising the same two issues, namely (1) whether the court erred by finding her unfit and (2) whether the court erred by finding it in the minor's best interest to terminate her parental rights. We consolidated the appeals, and after our review of the record and the parties' briefs, we affirm.

I. BACKGROUND

¶ 3   The minor, M.L., was the subject of Menard County case No. 17-JA-03, docketed

in this court as appellate court case No. 4-21-0707. The minor, R.L., was the subject of Menard County case No. 20-JA-01, docketed in this court as appellate court case No. 4-21-0708.

¶ 4        When each minor was a newborn, the Illinois Department of Children and Family Services (DCFS) took the minor into protective custody. The State filed petitions for adjudication of neglect based upon allegations of anticipatory neglect and the parents' failure to make progress toward the return of the minors in previous cases. DCFS supported these allegations with citations to those other cases, which involved the neglect of these minors' siblings.

¶ 5        M.L. and R.L. are the seventh and eighth child of respondent and her husband, Jed L., who is not a party to this appeal. Throughout these proceedings, the parents remained married and continued to reside together. In 2016, the parents' rights were terminated in five sibling cases (Menard County case Nos. 13-JA-1, 13-JA-5, 13-JA-6, 13-JA-7, and 13-JA-8). The sixth sibling was adjudicated neglected in November 2016 upon the parents' stipulation. The status of that case (Menard County case No. 14-JA-4) is unclear from the record.

¶ 6        On November 2, 2017, the trial court entered an adjudicatory order finding M.L. was a neglected minor under the theory of anticipatory neglect, in that she would be in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2016)) should she be in the care of her parents. On August 29, 2018, the court entered a dispositional order finding the parents unfit, adjudicating M.L. neglected, and making her a ward of the court.

¶ 7        On January 25, 2020, R.L. was born to the surprise of the caseworkers, as the parents had not shared with anyone that they were expecting another child. Four days later, the State filed its petition for adjudication of neglect on anticipatory-neglect grounds similar to the petition relating to M.L.

¶ 8        On March 16, 2021, the State filed a petition to terminate respondent's parental

rights to M.L., alleging she was unfit for (1) failing to make reasonable efforts to correct the conditions that were the basis for the removal of the minor within nine months after adjudication, specifically from June 18, 2019, to March 18, 2020 (750 ILCS 50/1(D)(m)(i) (West 2020)); (2) failing to make reasonable progress toward the return of the minor within nine months after adjudication, specifically from June 18, 2019, to March 18, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2020)); (3) failing to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)); and (4) her inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness, or an intellectual disability, and there existed sufficient justification to believe her inability to discharge parental responsibilities would exceed beyond a reasonable period of time (750 ILCS 50/1(D)(p) (West 2020)).

¶ 9 Also on March 16, 2021, in R.L.'s case, the State filed a combined amended petition for adjudication of wardship and termination of respondent's parental rights. The State alleged R.L. was neglected under an anticipatory-neglect theory for the following five reasons.

¶ 10 First, R.L. was neglected because he would not receive the proper or necessary support, education as required by law, or medical or other remedial care recognized under state law as necessary for his well-being based on respondent's requirement under her current case plan in M.L.'s case that she notify caseworkers of a change in the family composition, which she failed to do, and because she failed to receive prenatal care during her pregnancy. See 705 ILCS 405/2-3(1)(a) (West 2020).

¶ 11 Second, R.L. was neglected in that his environment would be injurious to his welfare if he was in respondent's care based on (1) respondent's failure to make reasonable

progress in the five sibling cases, which led to the termination of respondent's parental rights, and (2) respondent's failure to make substantial progress and reasonable efforts toward the goal of return home within 12 months in the sixth sibling case. See 705 ILCS 405/2-3(1)(b) (West 2020)).

¶ 12    Third, R.L. was neglected because the sixth sibling was adjudicated neglected upon respondent's stipulation that (1) she failed to provide the necessary feeding and other care to one of the five siblings as a newborn, which endangered his safety and well-being; (2) she failed to provide the necessary medical care for one of the five siblings by not treating a rash on the minor's genital area and legs from August 2013 to December 2013 endangering her safety and well-being; and (3) she admitted she failed to attend medical appointments for the sixth sibling on four separate dates between March 2015 and October 2015. 705 ILCS 405/2-3(1)(a) (West 2020)).

¶ 13    Fourth, R.L. was neglected because his sibling, M.L., was adjudicated neglected on November 2, 2017. See 705 ILCS 405/2-3(1)(a) (West 2020). And fifth, R.L. was neglected because respondent had not parented any of her children since the five older siblings were removed from the home in 2013.

¶ 14    Further, the State alleged it was in the public's and R.L.'s best interests that R.L. be made a ward of the court. It also requested an order terminating respondent's parental rights to R.L. in that she (1) has failed to maintain a reasonable degree of interest, concern, or responsibility as to R.L.'s welfare (750 ILCS 50/1(D)(b) (West 2020)) and (2) has an inability to discharge parental responsibilities supported by evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of a mental impairment, mental illness, or intellectual disability, or developmental disability, and there existed sufficient justification to believe the inability to discharge parental responsibilities would exceed beyond a reasonable period of time (750 ILCS 50/1(D)(p) (West 2020)).

- 4 -

¶ 15     Finally, the State alleged it would be in R.L.'s best interest and welfare that respondent's parental rights be terminated and that DCFS be appointed legal guardian with the power to consent to his adoption.

¶ 16     On April 23, 2021, the trial court conducted an adjudicatory hearing in R.L.'s case. The court heard testimony from three witnesses: (1) Apple Glover, a child protection investigator for DCFS; (2) Melinda McBride, a caseworker for the Center for Youth and Family Solutions (CYFS) on M.L.'s case; and (3) respondent.

¶ 17     Glover testified she took protective custody of R.L. when he was days' old prior to being discharged from the hospital because he was at-risk due to M.L.'s status of being in-care and due to the termination of respondent's rights in the five sibling cases. Glover also explained that "the parents had not corrected the conditions that initially led to [DCFS] involvement on their other cases and they had been deemed unfit parents," and their fitness had not been restored.

¶ 18     Much of McBride's testimony was regarding the father's noncompliance with the case plan. He had not completed substance abuse treatment, he was discharged unsuccessfully from individual counseling, he was not completing "drug drops," and he was not communicating with the agency. However, respondent was non-compliant with her case plan as well, in that she failed to disclose her pregnancy to her caseworker.

¶ 19     At the conclusion of the hearing, the court found R.L. to be a neglected minor. The court noted the parties had waived the 30-day time period in which to conduct a dispositional hearing.

¶ 20     On July 22, July 23, and August 20, 2021, the trial court conducted a combined fitness hearing on the State's petition to terminate respondent's parental rights. The State called four witnesses.

¶ 21    First, psychiatrist Dr. Terry M. Killian testified he performed psychiatric evaluations on each parent in November 2019 for the purpose of assessing their parenting capacity specifically regarding M.L. He performed subsequent evaluations upon R.L.'s birth. Although Dr. Killian testified in detail regarding his findings, suffice it to say, he diagnosed respondent with a personality disorder due to her inability to acknowledge any wrongdoing and her tendency to blame others. In Dr. Killian's opinion, "the likelihood [was] very low that [respondent would] eventually become fit to regain custody of any of [her] children."

¶ 22    Second, McBride testified she began as the CYFS caseworker on M.L.'s case in August 2019 and continued with R.L.'s case until February 15, 2020. Pursuant to respondent's October 2019 case plan, respondent was to (1) participate in individual counseling, (2) participate in a psychological evaluation, (3) participate in a domestic violence assessment and follow any recommendations, (4) attend the minors' medical appointments, (5) visit with the minors, (6) cooperate and communicate with DCFS and CYFS, and (7) maintain adequate housing and income. Respondent's case plan was rated overall unsatisfactory because, according to McBride, she was not making progress toward the completion of services. Most importantly, respondent was not "participat[ing] fully, openly[,] and honestly" in her domestic violence assessment or individual counseling.

¶ 23    Third, Shay Herbord, the CYFS caseworker for both minors after McBride, testified he began working on this case in February 2020. He testified as to the case plan covering October 2019 through April 2020. Respondent's tasks continued from the last case plan. According to Herbord, respondent's failure to disclose her pregnancy was "a huge play" in her unsatisfactory rating. And, although respondent was attending medical appointments, she was not acting appropriately during these sessions. She was not cooperating with the caseworker individually or

the agency as a whole. The case plan was rated overall unsatisfactory due to respondent's lack of cooperation and lack of progress.

¶ 24 Finally, Leiann Keller, the clinical supervisor at CYFS, testified she began therapy with respondent in September 2017. Respondent was to address ways to process trauma, learn healthy coping skills for her depression, and learn new and effective parenting techniques. Keller said respondent made minimal progress during the June 2019 to March 2020 timeframe. She was in denial as to why her children had been in care. Although Keller said she was meeting respondent weekly, respondent did not mention her pregnancy. Keller said respondent "wasn't holding herself accountable in disclosing the information that complied to her service plan" and she was blaming others for DCFS involvement. Keller closed respondent's case on April 1, 2021, because she "reached maximum benefits." She was unsuccessfully discharged for not making substantial progress for a two-year period. The State rested.

¶ 25 On September 20, 2021, the trial court entered a written order, finding respondent unfit as alleged in the State's petition to terminate in both cases with one exception. The court found the State had not sufficiently proved respondent was unfit based on her inability to discharge parental responsibilities based on a mental disability in R.L.'s case.

¶ 26 On October 1, 2021, the trial court conducted a combined best-interest hearing. Herbord testified M.L., then four years' old, had resided in the same foster home since her birth in September 2017. Her foster parents were willing to provide her permanency through adoption. This home has provided M.L. with her basic needs and is a clean, safe, and loving environment. M.L. is bonded with her foster parents, calling them "mom" and "dad." There are two biological boys in the home who consider M.L. their little sister. M.L. is also very bonded to the two family dogs. According to Herbord, it appeared M.L. felt secure and loved in the home.

¶ 27        As for R.L., Herbord testified he had been initially placed with his foster mother's mother for approximately 18 months. However, during that time, R.L.'s current foster parents were considered "collateral caregivers," meaning they were involved in R.L.'s care. Also in the home were two of R.L.'s biological brothers, who had been adopted by the original foster parents. Due to the age of the original foster parents and the stress that accompanied the adoption of two boys, it seemed better for all concerned to have the current foster parents care for R.L. He was the only child in their home. The current foster parents were willing to provide R.L. with permanency through adoption. Herbord said R.L. was doing well in his current foster placement.

¶ 28        R.L.'s foster mother testified that R.L. has been with her and her husband since June 4, 2021, but she has known R.L. since he was placed with her mother upon birth. R.L. sees two of his biological brothers daily since her mother keeps R.L. during the day while the foster mother is working. R.L. sees M.L. weekly, as she is living with the foster mother's sister and brother-in-law. R.L. refers to the foster mother as "momma" and her husband as "dada." R.L. was currently engaged in speech therapy and would begin developmental therapy soon. She said she and her husband were "[a]bsolutely" willing to adopt R.L. They recently purchased a four-bedroom home in Petersburg, in which R.L. will have his own room. They are expecting a baby in February and have been preparing R.L. for the new addition.

¶ 29        M.L.'s foster father testified he and his wife live in Springfield with his two stepsons, ages 13 and 15, and M.L., age 4. M.L. attends daycare at her foster mother's workplace. M.L. visits with her biological brothers generally every weekend when the families visit the foster mother's parents. M.L. refers to her foster parents as "mommy" and "daddy." She is bonded to her foster family and the two pet dogs. The foster father said he and his wife want to adopt M.L. because she is "basically like [their] daughter. She fits right in perfectly, and even her foster

brothers refer to her as their sister."

¶ 30    At the close of evidence, the trial court reminded the parties of the following:

"[W]e are arguing in regards to [M.L.], best interest. We completed the fitness portion. We're now on the best interest. In regards to [R.L.], it becomes a little more complicated because we're still at disposition. This is one continued dispositional hearing. The court has previously ruled on [s]ection 2-21(5) [(705 ILCS 405/2-21(5) (West 2020))], the first three parts of that section, in the order which was entered on September 20[, 2021].

So, now, the issues would be in [s]ection [four] [(705 ILCS 405/2-21(5)(iv) (West 2020))] in regards to [R.L.], plus all the additional findings at the dispositional. Just so everybody's clear procedurally where we're at."

¶ 31    After considering the best-interest report, the testimony presented, the arguments of counsel, and the statutory best-interest factors, the trial court, in a written order dated November 2, 2021, determined it was in M.L.'s and R.L.'s best interests to terminate respondent's parental rights.

¶ 32    This appeal followed.

¶ 33                         II. ANALYSIS

¶ 34    On appeal, respondent asserts the trial court's fitness and best-interest findings were against the manifest weight of the evidence. We disagree.

¶ 35    The Juvenile Court Act of 1987 (Juvenile Court Act) sets forth a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/1-1 *et seq.* (West 2020). Initially, the State must establish, by clear and convincing evidence, that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705

ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). In this appeal, respondent challenges both of the court's findings.

¶ 36    We will not disturb a trial court's finding with respect to parental unfitness unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 37                        A. Fitness Determination as to M.L.

¶ 38    In the trial court's written September 20, 2021, order, respondent was found unfit on four grounds related to M.L.: (1) she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor during a specified nine-month period following the adjudication of neglect, namely between June 18, 2019, and March 18, 2020 (750 ILCS 50/1(D)(m)(i) (West 2020)); (2) she failed to make reasonable progress toward the return of the minor during the same specified nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)); (3) she failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)); and (4) she has the inability to discharge parental responsibilities, supported by competent evidence of a mental disability and such disability would extend beyond a reasonable time period (750 ILCS 50/1(D)(p) (West 2020)). Only one ground, if properly proven, is sufficient to support the trial court's finding of parental unfitness. See *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 39    Reasonable progress is measured by an objective standard that considers the progress made toward the goal of returning the child to the parent. *In re M.A.*, 325 Ill. App. 3d

- 10 -

387, 391 (2001). A parent has made reasonable progress when "the progress being made by a parent to comply with the directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the near future, will be able to order the child returned to parental custody." (Emphasis and internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 40　　　　Respondent argues she "completed her required services and was on her way to regaining custody and guardianship," hindered only by her husband's lack of progress. The record belies this assertion. The evidence showed that between June 2019 and March 2020, respondent's progress on her case plan was rated overall unsatisfactory. Testimony from the caseworkers and her counselor demonstrated that, although she participated in the domestic violence assessment, it was apparent she was not open and honest with the evaluator. Further, she engaged in counseling for four years yet failed to make any progress toward her counseling goals. She remained unable to accept responsibility for her children being in care, and instead, blamed others for their fate. She was unsuccessfully discharged from counseling, not due to her lack of attendance but rather due to her inability or unwillingness to internalize the discussions. She failed to cooperate with caseworkers, the agency, and DCFS as demonstrated by her failure to disclose her pregnancy. According to Dr. Killian, respondent was not likely to ever regain fitness to have custody of her children due to her failure to fully engage and progress in services and to comply with case-plan directives.

¶ 41　　　　For the above reasons, we cannot say the trial court's determination respondent failed to make reasonable progress toward having M.L. returned to her care within the relevant nine-month period following the adjudication of neglect was against the manifest weight of the evidence. Because we have upheld the court's findings as to one ground of unfitness, we need not

review the other grounds. See also *In re D.H.*, 323 Ill. App. 3d 1, 9 (2001).

¶ 42                              B. Fitness Determination as to R.L.

¶ 43          In the trial court's written September 20, 2021, order, respondent was found unfit on one ground related to R.L.: she failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)).

¶ 44          As to this fitness finding, respondent claims due to the expedited nature of the termination proceedings, she was deprived of the opportunity to demonstrate her fitness to parent R.L. She claims the pandemic, along with not having a reliable vehicle, precluded her from attending or completing recommended services.

¶ 45          Noncompliance with an imposed service plan may be sufficient to warrant a finding of unfitness under subsection (b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)). *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). It is clear from the record respondent did not seek prenatal care during her pregnancy with R.L. Regardless of when she discovered her pregnancy, at no time did she seek medical care. As the trial court noted, respondent's failure to disclose her pregnancy and obtain prenatal services, coupled with her "continued unsatisfactory progress on service plans, not only in regards to minor, [M.L.]'s case, but the previous six (6) minor children, demonstrates an objectively unreasonable interest, concern, or responsibility as to the minor's welfare." We cannot say the court's order finding respondent unfit on this ground and for the reasons stated was against the manifest weight of the evidence.

¶ 46                          C. Best-Interest Determination for M.L. and R.L.

¶ 47          Respondent also argues the trial court erred in determining termination of her parental rights was in the minors' best interests. We will not reverse a best-interest determination unless it was against the manifest weight of the evidence, which occurs "only if the facts clearly

demonstrate that the court should have reached the opposite result." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 48　　　　Once a trial court has determined a parent is "unfit," it must next determine whether termination of parental rights is in the minor's best interest. See 705 ILCS 405/2-29(2) (West 2020). At the best-interest stage, the focus shifts from the parent to the child, and the issue is "whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *D.T.*, 212 Ill. 2d at 364. Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* Section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)) sets forth the best-interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best-interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child.

¶ 49　　　　Here, the trial court's best-interest determination was not against the manifest weight of the evidence. According to the testimony at the best-interest hearing, the minors are thriving in their respective foster homes and have the best opportunity in those homes to live in a safe, secure, and loving environment. Although the minors reside in separate homes, the testimony of the foster parents indicated the minors will be able to remain in close contact with each other. The respective foster families are related to each other and to the family who adopted the minors' two biological brothers. Not only did the testimony and other evidence suggest the minors were well-bonded and emotionally healthy in their respective homes, but they have the opportunity to

achieve permanence through adoption while maintaining a connection with each other and their siblings. Accordingly, we cannot say the trial court's best-interest determination was against the manifest weight of the evidence.

¶ 50                                   III. CONCLUSION

¶ 51          For the foregoing reasons, we affirm the trial court's judgment.

¶ 52          Affirmed.